PRECEDENTIAL

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 11-2552

_____

UNITED STATES OF AMERICA,
                                        Appellant

v.

CRAIG CLAXTON

_____

On Appeal from the District Court of the Virgin Islands
(D.C. No. 3-06-cr-00080-009)
District Judge:  Honorable Curtis V. Gomez

_____

Argued: Monday, May 7, 2012

Before:   CHAGARES, JORDAN, and COWEN, *Circuit
Judges*.

(Filed: July 9, 2012)

_____

Demetra Lambros, Esq.   [ARGUED]
United States Department of Justice
Appellate Section
950 Pennsylvania Avenue, N.W. – Rm. 1264
Washington, DC   20530

Kim R. Lindquist, Esq.
Nolan D. Paige, Esq.
Delia L. Smith, Esq.
Office of United States Attorney
5500 Veterans Bldg. – Suite 260
Charlotte Amalie, St. Thomas, VI  00802
        *Counsel for Appellant*

Susan B. Moorehead, Esq.   [ARGUED]
Smock & Moorehead
No. 11A Norre Gade
P.O. Box 1498
St. Thomas, VI   00804
        *Counsel for Appellee*

————————————

OPINION OF THE COURT

————————————

JORDAN, *Circuit Judge*.

A jury found Craig Claxton guilty of conspiring to possess cocaine with the intent to distribute, but the District Court of the Virgin Islands of the United States entered a judgment of acquittal in Claxton's favor on the ground that there was not enough evidence for "a reasonable jur[y] to conclude … that … Claxton knowingly participated in th[e]

conspiracy." (Joint App. at 6.) The government appeals that decision, urging that the evidence suffices to establish Claxton's involvement in the charged conspiracy. We agree, and will reverse the District Court's judgment of acquittal and remand for sentencing.

## I.     Factual Background and Procedural History

Claxton was indicted with other individuals for participating in a drug-trafficking conspiracy, in violation of 21 U.S.C. § 846. The indictment alleged that, from at least 1999 until October 2005, the conspirators sought to possess large quantities of cocaine in order to distribute that cocaine for "significant financial gain and profit." (Joint App. at 43.)

### A.     *Facts*

James Springette was the conspiracy's leader, running a drug-trafficking organization that routinely brought cocaine from Colombia into Venezuela, and then flew bales of it to the waters surrounding the Virgin Islands so that it could be retrieved, stored, and eventually smuggled into the continental United States for sale.

Springette's "organization was run like a large company" (*id.* at 110) with various departments. (*See, e.g.*, *id.* at 89 (Springette's testimony that his organization was "like [a] watch … . [Y]ou might see one or two pieces moving on your watch, but under your watch there are many moving pieces").) Elton Turnbull, Springette's cousin and his "right-hand man" (*id.* at 72), characterized Springette as the "president" of that "company" (*id.* at 111). Gelean Mark

3

served under Springette,[1] and was responsible for shipping the cocaine from the Virgin Islands into North Carolina through couriers. Glenson Isaac received the cocaine in North Carolina, sold it, and sent the proceeds back to Mark in the Virgin Islands.

Isaac acknowledged that he was "the main guy in North Carolina to receive and sell multiple kilos of cocaine and send[] the proceeds back." (*Id.* at 126.) He testified at trial that he used female couriers to carry the drug money from North Carolina to the Virgin Islands. In exchange for $1,000, those couriers would travel to the island of St. Thomas with $190,000 or more packed in their luggage. Once in St. Thomas, a member of Springette's organization would pick them up so that the money they transported could be collected by Mark. (*See id.* at 102 (Turnbull's testimony that "[Mark] would either pick up the couriers personally himself, or have another member of the organization pick up the couriers").)

Isaac identified Claxton as one of the "member[s] of the organization" who performed that task. (*Id.* at 136.) Indeed, although Springette testified that he did not know or deal with Claxton, Isaac told the jury that Claxton helped him "sell[] … hundreds and hundreds of kilograms of cocaine" (*id.* at 171) by "retriev[ing] the girls out of the airport" in St. Thomas, "tak[ing] them to Mark, check[ing] them into [a] hotel[,] and pay[ing] them" (*id.* at 136). Other evidence at

---

[1] The indictment states that Mark was "the owner, leader and organizer of th[e] drug trafficking organization." (Joint App. at 44.) The evidence at trial, however, demonstrated that Mark was subordinate to Springette.

trial confirmed that account, showing that Claxton, who used the aliases "Flintstone" and "Sunku," interacted with Isaac's couriers on eight different occasions between June 2004 and July 2005.

### 1. *The Couriers' Testimony*

Three different couriers – Alexis Wright, Valencia Roberts, and Demeatra Cox – offered testimony detailing their encounters with Claxton while transporting cash from North Carolina to the Virgin Islands on Isaac's behalf.

### i. *Alexis Wright*

Wright was Isaac's coworker at a McDonald's restaurant in North Carolina. She testified that she made six trips to St. Thomas at Isaac's behest, and saw Claxton on four of those trips.

Wright first saw Claxton in June 2004 when she traveled to St. Thomas with a friend. Upon arriving in St. Thomas, Isaac called Wright on her cell phone and told her to "look for the skinny guy who has half of his face shaved." (*Id.* at 179.) Shortly thereafter, Wright was approached by Claxton, who fit Isaac's description and introduced himself to Wright as "Flintstone." Wright handed Claxton the phone so that Isaac could confirm that Wright had met the right individual. After Isaac did that, Wright and her friend left the airport with Claxton and an unidentified individual ("Person X").[2]

---

[2] For ease of reference, we use the designation "Person X" for any person who was not identified at trial by a name or

5

Wright, Claxton, and her friend were then dropped off to eat lunch while Person X left with Wright's luggage. After they ate, Claxton called Person X to pick them up. Person X arrived and took Wright and her friend to their hotel, where Wright's luggage was returned. During the following three or four days that Wright and her friend spent in St. Thomas, Claxton repeatedly took them out to eat. On their way to one particular restaurant, they stopped at a place known as the "feed shop." (*See id.* at 181 (Wright's testimony that Claxton took her to restaurants while she was in St. Thomas and that, while "going towards the restaurant," they "stopped at a feed shop").) Springette's organization used the feed shop to launder its drug money. (*See id.* at 122-23 (Turnbull's testimony that he owned the feed shop with Mark and used it as a legitimate business so as to "allow the opportunity for [the drug] money to be laundered through the business").) While there, Wright saw "Butchie,"[3] whom Wright knew from a previous trip she had taken to St. Thomas with Isaac.

Wright next saw Claxton in September 2004, when she was again met by Claxton and Person X after flying money to St. Thomas on Isaac's behalf. Wright did not recall if she was supposed to be paid for making that trip, but she received $1,000 from Claxton when she arrived. She saw him a third time at the St. Thomas airport when she traveled to the Virgin Islands in December 2004. Claxton, who was alone to greet

a nickname, although the various unidentified individuals to whom we refer are not necessarily the same person.

[3] As with other individuals who were mentioned at trial, *see supra* note 2 and *infra* note 4, Butchie's real name was never revealed to the jury.

6

her on that occasion, escorted her to a car, and, after driving with her from the airport, stopped on the side of the road where another car, occupied by an individual Wright identified at trial by the nickname "What's Up,"[4] was already parked. Leaving Wright in his car, Claxton took Wright's luggage to What's Up's car, got inside that car, and remained there for five-to-ten minutes. After returning to his own vehicle, Claxton drove Wright to the airport, as she had planned to fly back to North Carolina that same day. They did not reach the airport in time, however, so Claxton paid for Wright's hotel room for the night.

Wright also saw Claxton during a July 2005 trip for Isaac, when Claxton shuttled her to the airport.

ii. *Valencia Roberts*

Roberts was Wright's cousin, and was recruited by Wright to "bring some money [from North Carolina] to St. Thomas on [Isaac's] behalf." (*Id.* at 211.) Roberts first traveled to St. Thomas for that purpose in July 2004. Upon arriving in St. Thomas, Claxton, who identified himself as Flintstone, picked Roberts up from the airport. After leaving the airport, Claxton stopped on the side of the road next to the feed shop, and took Roberts's bag to another car that drove off with it. Claxton then "went inside of the feed shop … for

---

[4] In arguing against Claxton's motion for a judgment of acquittal, the government suggested to the District Court that the evidence showed that "What's Up" was Mark. The government has not made that factual representation on appeal, however, and it does not appear that the jury was ever apprised of the real name of "What's Up."

7

maybe ten or fifteen minutes" before eventually leaving to take Roberts to her hotel. (*Id.* at 214.) Claxton returned Roberts's bag to her a few hours later, when he picked her up to take her out to eat.

Roberts testified that she also saw Claxton during a September 2004 trip, but did not elaborate about what happened on that occasion.

### iii.    *Demeatra Cox*

Cox was recruited to travel to St. Thomas for Isaac by Everett Mills, who served as Isaac's cocaine distribution partner in North Carolina. She offered testimony regarding two trips she made to St. Thomas on Isaac's behalf.

The first occurred in July 2004, when Isaac asked Cox to go to St. Thomas and "bring something with [her]." (*Id.* at 227.) Claxton, who identified himself as "Sunku," picked Cox up from the airport, "grabbed [her] bag" from the conveyor belt, "dropped [her] off at the [hotel], and … took the bag with him." (*Id.* at 229.) Her clothes were returned to her in a different bag later that day, and she spent three additional days in St. Thomas before being escorted back to the airport by Claxton. Isaac returned Cox's original bag to her after she was back in North Carolina.

Cox made a second trip to St. Thomas in August 2004, and was met by Claxton and Butchie when she arrived. Butchie took Cox's bag with him, while Claxton left to take Cox to her hotel. Her clothes were returned in a new bag later that day when Isaac, Claxton, Butchie, and an individual

8

she identified as "Maestro" met her at her hotel. During that meeting, Isaac paid her for making the trip.

## 2. *Isaac's Testimony*

Isaac, who admitted to being one of the "main guy[s]" in Springette's organization (*id.* at 126) and being involved "in drug-dealing activities most of [his] life" (*id.* at 159), also incriminated Claxton at trial. Repeatedly identifying Claxton as one of the "member[s] of the organization" (*id.* at 136), Isaac testified that he traveled to St. Thomas on at least ten occasions and met with Claxton and other "organization" members at a property referred to as "the farm" (*id.* at 152), where the organization's cocaine was stored. During those visits, Isaac and other members of the organization would "talk about drug activities and fight dogs." (*Id.* at 156.) Isaac also testified that, at some point in time,[5] he went with Claxton to Atlantic City to gamble and try to win $60,000 to settle a cocaine-related debt with Mark.

## B. *Procedural History*

After the government rested its case, Claxton moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29. The District Court expressed concern about the sufficiency of the evidence introduced by the government, but reserved judgment on the motion and submitted the case to the jury. The jury, in turn, found Claxton guilty, prompting him to renew his motion for a judgment of acquittal. On four different occasions, the District Court considered whether to

---

[5] As discussed *infra* in note 20, Claxton argues that the gambling trip occurred after the conspiracy concluded.

grant the motion, and ultimately decided to do so.[6]  Speaking at a sentencing hearing, the Court indicated it would issue a written opinion memorializing its ruling, though apparently that was not done.  The Court did, however, enter a judgment of acquittal, which the government timely appealed.

## II.    Discussion[7]

The government argues that the District Court errantly decided the evidence was insufficient to establish Claxton's guilt.  In considering that argument, we "review the [trial] record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt[] beyond a reasonable doubt based on the available evidence."  *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005) (citations and internal quotation marks omitted).  In the context of a drug conspiracy prosecution brought under 21 U.S.C. § 846, that standard can only be met

---

[6] The Court heard arguments on Claxton's motion for judgment of acquittal at the conclusion of the government's case on May 30, 2010, in separate motion hearings on February 15, 2011 and April 5, 2011, and then again at a May 11, 2011 sentencing hearing.

[7] The District Court had jurisdiction pursuant to 18 U.S.C. § 3231.  *See* 48 U.S.C. § 1612(a) (stating that the District Court of the Virgin Islands "shall have the jurisdiction of a District Court of the United States").  We have jurisdiction under 28 U.S.C. § 1291 and 48 U.S.C. § 1613, and "exercise[] plenary review" of the Court's judgment of acquittal. *United States v. Boria*, 592 F.3d 476, 480 (3d Cir. 2010).

10

if the evidence establishes "(1) a shared unity of purpose, (2) an intent to achieve a common illegal goal, and (3) an agreement to work toward that goal, which [the defendant] knowingly joined." *United States v. Boria*, 592 F.3d 476, 481 (3d Cir. 2010); *see United States v. Pressler*, 256 F.3d 144, 147 (3d Cir. 2001) (same). Here, Claxton contends that the District Court properly entered a judgment of acquittal because the evidence at trial failed to prove that he was a knowing conspirator in a criminal enterprise, let alone one that was engaged in drug trafficking. Thus, the question we must answer is whether a rational fact-finder could conclude beyond a reasonable doubt that Claxton knowingly participated in Springette's drug-trafficking organization.[8]

### A. *Proving Knowledge in Drug Conspiracy Cases*

As we have often recognized, a finding of guilt in a conspiracy case does not depend on the government introducing direct evidence that a defendant was a knowing participant in the conspiracy; circumstantial evidence can carry the day. *See Boria*, 592 F.3d at 481 ("A conspiracy can be proven by direct *or* circumstantial evidence." (emphasis

---

[8] Because the government has not, at any point, argued that Claxton was willfully blind to his involvement in Springette's organization, we do not consider whether a rational jury could have found that Claxton acted "knowingly" based on that concept. *Cf. United States v. Cordero*, 815 F. Supp. 2d 821, 832 (E.D. Pa. 2011) (noting that, because a willful blindness instruction was given, the "the jury verdict must stand" if the evidence supports the fact that the defendant "deliberately ignored the high probability that [he or she was] participating in a drug conspiracy").

11

added)); *United States v. Wexler*, 838 F.2d 88, 90 (3d Cir. 1988) ("The elements of a conspiracy may be proven entirely by circumstantial evidence … ."). In drug conspiracy cases, however, we have arguably asked more of prosecutors than our statements regarding the adequacy of circumstantial evidence express, "requir[ing] some additional piece of evidence imputing knowledge of drugs to the defendant" even in "the presence of otherwise suspicious circumstances." *Boria*, 592 F.3d at 482; *see id.* at 488 n.12 (Fisher, J., concurring) ("It may be that the difficulty of producing evidence that the defendant knew that the subject matter was a controlled substance has turned our standard of review, not in name but in application, into a requirement for direct evidence.").

In *United States v. Cartwright*, for example, a divided panel of our court held the evidence insufficient to establish a drug conspiracy charge even though the defendant, who had "a semi-automatic firearm, a cellular phone, $180 in cash, and a Motorola Timeport two-way text messaging device" on his person, was observed walking side-by-side with an alleged coconspirator who had just negotiated a drug-sale transaction. 359 F.3d 281, 288 (3d Cir. 2004). As we explained it, there was simply no basis upon which a jury could conclude that the defendant had knowledge that he was participating in a drug-trafficking conspiracy.[9]  *Id.*  A divided panel of our

---

[9] More specifically, the only evidence supporting the defendant's knowledge of drugs was that:

> (1) [The defendant] made his first appearance in the breezeway at the same time that [the coconspirator] was observed carrying the shopping bag containing the cocaine; (2) [the

12

court likewise deemed the evidence insufficient to uphold a jury verdict in *United States v. Idowu*, because the only evidence tying the defendant to a drug-purchase conspiracy was the fact that the defendant drove in a vehicle with an alleged coconspirator, opened a bag in that vehicle to display money to a putative drug dealer, and said "[t]hey didn't pack this thing" to his coconspirator upon receiving a different bag from the drug dealer. 157 F.3d 265, 267-68 (3d Cir. 1998).

In *United States v. Boria*, we summarized those and other drug conspiracy cases holding evidence insufficient to sustain a conspiracy conviction,[10] and we deemed it notable

defendant] walked side-by-side with [the coconspirator] through the breezeway and the two were observed talking to each other; (3) [the defendant] possessed a semi-automatic firearm, a cellular phone, $180 in cash, and a Motorola Timeport two-way text messaging device; and (4) [the defendant] did not possess any keys to a vehicle of his own.

*Cartwright*, 359 F.3d at 288. Although that evidence "support[ed] a finding that [the defendant] acted as a lookout for [the coconspirator]," we deemed it insufficient to sustain a drug conspiracy verdict. *Id.* at 286.

[10] In addition to *Cartwright* and *Idowu*, we surveyed four other drug conspiracy cases in *Boria*. *See United States v. Thomas*, 114 F.3d 403, 404-05 (3d Cir. 1997) (holding the evidence insufficient where a defendant who had no prior relationship with the alleged coconspirators "check[ed] on a bag" that had drugs in it, at the direction of one of the conspirators, but where there was no evidence that the

13

that "none of the[m] … included co-conspirator statements implicating the defendant." 592 F.3d at 484. Relying on that fact in particular, we distinguished the cases in which we have set aside drug conspiracy verdicts, and upheld the jury's guilty verdict.[11] The defendant in that case, Ruben Boria, was

---

defendant knew the contents of the bag); *United States v. Salmon*, 944 F.2d 1106, 1114 (3d Cir. 1991) (evidence that the defendant "performed surveillance, spoke to coconspirators, and possessed surveillance equipment" when arrested did not permit a "reasonable jury to find beyond a reasonable doubt that [the defendant] knew that cocaine or another controlled substance was the object of the transaction"); *Wexler*, 838 F.2d at 91 (concluding that while there was "ample circumstantial evidence … [for] … the jury [to] have concluded that [the defendant] was involved in a conspiracy" because he served as a lookout, spoke with a coconspirator during the operation, and "fictitiously obtained [a] CB radio … in the car he drove," there was no evidence he "knew that a controlled substance was" involved in that conspiracy and the conspiracy verdict was therefore improper); *United States v. Cooper*, 567 F.2d 252, 254-55 (3d Cir. 1977) (holding the evidence insufficient where the defendant rode with an alleged coconspirator in a truck with marijuana in a padlocked compartment in the trunk, because there was no evidence that the defendant had access to the compartment or key and the evidence adduced was "perfectly consistent with innocence").

[11] We also observed that "[t]here was no evidence of a prior relationship between the defendant and the coconspirators" in several of the drug conspiracy cases in which we have, in the past, deemed the evidence to be

charged with participating in a drug conspiracy after he was caught driving a tractor-trailer that contained "cocaine hidden among boxes of mostly rotten fruit" in the trailer, which he never accessed. *Id.* at 478. At trial, a witness named Jose Alvarado testified that he was told by a conspirator, Miguel Morel, that Boria would meet him early in the morning to pick up the tractor-trailer from him in order to take it "to a garage to unload the drugs that were in the back."[12] *Id.* at 478 (citation and internal quotation marks omitted). Although Alvarado had never dealt with Boria before, he arrived as promised that morning, "identified himself as Ruben[,] and confirmed that Morel had sent him." *Id.* at 479. Those suspicious circumstances, as we explained, would permit a rational jury to conclude that Boria knew "something criminal was afoot." *Id.* at 486.

While that did not, itself, suffice to sustain a conspiracy verdict in light of "our strict approach to sufficiency in drug conspiracy cases," *id.* at 481 n.9, we concluded that Alvarado's testimony relaying Morel's description of Boria's role sufficed to enable a rational jury to find that Boria had knowledge that he was participating in a conspiracy involving "drugs, as opposed to some other form of contraband," *id.* at 486. As we explained it:

inadequate. *Boria*, 592 F.3d at 483 (citing *Thomas*, 114 F.3d at 405-06 and *Cartwright*, 359 F.3d at 291).

[12] While the conspirators evidently thought Alvarado was working with them, he was actually a "Drug Enforcement Agency … informant" who "managed to inform law enforcement" about the scheme. *Boria*, 592 F.3d at 478.

[T]he case before us does have additional facts imputing knowledge of drugs. We reach this conclusion after considering the suspicious circumstances of this case, including that Boria met … Alvarado [and a coconspirator] early in the morning after only a few hours of sleep, … did not hesitate in approaching the tractor-trailer containing the cocaine and then approaching the vehicle Alvarado was driving, … [and] confirmed his identity and that Morel had sent him … .

The "truly distinguishing fact," however, is Alvarado's testimony that Boria's role was to "take [the tractor-trailer] to a garage to unload the drugs that were in the back of the tractor-trailer." Alvarado re-iterated Boria's role on cross-examination, testifying that, according to Morel, Boria was responsible for "taking the truck from [his] hands to take it to another garage to unload it," and for "tak[ing] the driver of the tractor-trailer to finish off what needs to be done inside the truck." Although Boria never accessed the trailer, this co-conspirator testimony imputes to Boria knowledge that the tractor-trailer he was assigned to direct to a garage contained drugs, which is the additional fact necessary to support the jury's guilty verdict. The cases in which we declined to find sufficient evidence did not include such evidence, and we find its presence in this case decisive.

16

*Id.* at 485 (second paragraph alterations in original) (internal citations omitted).

In so holding, we relied on *United States v. Reyeros*, where we likewise distinguished the "cases in which we reversed drug possession and distribution conspiracy convictions for lack of evidence that the defendant knew the purpose of the conspiracy involved drugs," based on the presence of a statement that could be attributed to the defendant. 537 F.3d 270, 278 (3d Cir. 2008). There, unlike *Boria*, the witness recounted an admission by a defendant that evinced that defendant's knowledge of drugs. *See Reyeros*, 537 F.3d at 279 (testimony that the defendant said he "wouldn't take little amounts of drugs to use his Customs position, it would be too little of a deal. He needed big deals. Big drug deals" (citation and internal quotation marks omitted)). But although Alvarado's testimony did not, as the statement in *Reyeros* did, relay a statement the defendant himself made, we did not find that distinction significant to our sufficiency-of-the-evidence inquiry. Rather, "we conclude[d] it [was] appropriate to attribute [to Boria] Morel's statement regarding Boria's role" in the conspiracy, based on the principle that "statements of one [coconspirator] can … be attribut[ed] to all."[13]  *Boria*, 592 F.3d at 485 n.10 (citation and internal quotation marks omitted).

---

[13] That principle is embodied in Federal Rule of Evidence 801, which provides that statements are not hearsay if they are offered against an opposing party and are "made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). The theory is that "statements of one [conspirator] can … be attributable to all"

B.      *Claxton's Knowledge of Drugs*

Here, the District Court acknowledged when entering a judgment of acquittal in Claxton's favor that the evidence permits a "fair inference" that Claxton was "involved in something, if not illicit, at least suspicious." (Joint App. at 5.) That is a striking understatement. Notwithstanding Claxton's protestations that the evidence fails to establish that "[he] knew he was participating in a criminal enterprise" (Appellee's Opening Br. at 12), there is strong evidence that he knew what was inside the couriers' luggage he was helping to transport was money from illegal activities, (*see, e.g.*, Joint App. at 184-85 (Wright's testimony about her December 2004 trip in which Claxton picked her up, brought her luggage to What's Up's car, and stayed there for five-to-ten minutes before returning to his own car to drive Wright back to the airport that same day); *see also id.* at 233-34 (Cox's testimony that Claxton and Isaac were "joking about bringing [her] … clothes [which had been packed in her luggage] back in the [new] garment bag," and that Isaac paid her $1,000 in front of Claxton); *id.* at 183 (Wright's testimony that Claxton paid her $1,000 in exchange for bringing her bag to the Virgin Islands)). Thus, we are confident that a rational trier of fact could conclude beyond a reasonable doubt that Claxton knew he was a conspirator in some kind of illicit enterprise, as he plainly knew "something criminal was afoot." *Boria*, 592 F.3d at 486.

That, of course, is not enough under our precedents to sustain his conviction; there must also be enough evidence for

because "each conspirator is an agent of the other." *United States v. Pecora*, 798 F.2d 614, 628 (3d Cir. 1986).

18

a jury to rationally find that Claxton had knowledge that he was involved in an illegal enterprise involving "drugs, as opposed to some other form of contraband." *Id.* We conclude that the evidence, as a whole, permits such a finding because Claxton was expressly identified as a member of the conspiracy, repeatedly took actions to further its ends, and had a close and repeated association with its members and facilities.

We begin with Isaac's testimony identifying Claxton as a coconspirator. That testimony, as in *Boria*, distinguishes this case from those in which we have held evidence of the defendants' knowledge of drugs to be lacking. Isaac was a "main guy" in Springette's organization (Joint App. at 126), and specifically identified Claxton as an "organization member,"[14] (*see id.* at 136 (identifying Claxton as one of the "member[s] of the organization"); *id.* at 146 (describing Claxton as a "member[] of the organization"); *id.* at 152 (stating Claxton was an "organization" member he "[saw] at the farm")). Isaac also observed that, by working with the money couriers when called upon to do so, Claxton helped in the organization's business of trafficking "hundreds and hundreds of kilograms of cocaine." (*Id.* at 171.) Isaac's

---

[14] Claxton emphasizes that an organizational chart Isaac prepared does not identify Claxton as a member of Springette's organization. While true, his argument that that omission undermines any proof of his guilt was considered and evidently found wanting by the jury; it is not our role to revisit it. *Cf. Brodie*, 403 F.3d at 133 (noting that we "review the [trial] record in the light most favorable to the prosecution" (citations and internal quotation marks omitted)).

19

identifications of Claxton do, to be sure, differ from the coconspirator testimony offered in *Boria* in two respects. First, because they are identifications at trial as opposed to statements made during the course of the conspiracy, they cannot simply be treated as Claxton's own admissions that he was a member of the organization of which Isaac spoke. *Cf. Boria*, 592 F.3d at 485 n.10 (attributing "Morel's statement regarding Boria's role" in the conspiracy to Boria based on the principle "that … statements of one [coconspirator] can … be attribut[ed] to all" (citation and internal quotation marks omitted)). Second, because they do not expressly refer to Claxton's knowledge of drugs, they require the jury to make an additional inference to establish such knowledge. *Cf. id.* at 486 ("Alvarado's testimony that Boria was responsible for unloading the drugs, attributable to Boria as a co-conspirator, … serves as the crucial … fact imputing knowledge of drugs … .").

But while a direct statement that can be attributed to a defendant as an admission may be more probative of knowledge of drugs than an admitted-conspirator's trial testimony regarding who was or was not his coconspirator, the latter account remains highly pertinent to the question of the defendant's knowing complicity in the crime. *Cf. United States v. Hernandez*, 962 F.2d 1152, 1155-57 (5th Cir. 1992) (testimony by coconspirators regarding the defendant's participation in a conspiracy was, on its own, sufficient to sustain a marijuana distribution conspiracy charge even absent independent corroboration, because "[t]he jury … credited [the coconspirators'] version of events"). It does not establish knowledge as directly as does an admission, but we have never set the bar as high as that. Again, "a conspiracy may be proven entirely by circumstantial evidence," *Wexler*,

20

838 F.2d at 90, and we have asked simply that the circumstantial inferences drawn from the evidence bear a "logical or convincing connection to established fact," *Cartwright*, 359 F.3d at 291. For the very reason that direct evidence of criminal knowledge is unusual, we have explicitly recognized that the government may circumstantially establish the element of knowledge "grain-by-grain until the scale finally tips." *United States v. Iafelice*, 978 F.2d 92, 98 (3d Cir. 1992).

In this case, Isaac's account that Claxton was a "member of the organization" is strong circumstantial evidence of Claxton's knowing involvement in Springette's drug conspiracy. Unlike the evidence in many drug conspiracy cases we have dealt with in the past, *see supra* note 10 and accompanying text, Isaac's testimony permits the rational conclusion that Claxton knowingly participated in a drug (as opposed to some other) conspiracy. *Cf. Idowu*, 157 F.3d at 269, 270 (noting the "government's strongest argument [was] that [the coconspirator's] invitation to [the putative drug dealer] to get into the car, in which Idowu was sitting, reflects such total confidence in Idowu that an inference can be drawn that Idowu knew the full nature of the transaction," but determining that was not enough to show that "Idowu knew that drugs were in fact the subject matter of the transaction").

The evidence at trial showed that Springette's drug "organization was run like a large company" (Joint App. at 110), with various departments, managers, and employees, (*see id.* at 89 (Springette's testimony that his organization was "like [a] watch")). It was in existence for a number of years, and involved multiple drug-related transactions.

21

Claxton was responsible for facilitating several of those transactions, and did so by performing the same kinds of tasks, often with the same people.[15] *Cf. Cartwright*, 359 F.3d at 288 (involving only a single drug transaction). None of the prior drug conspiracy cases in which we have found the evidence insufficient involved multiple transactions, *see supra* note 10 and accompanying text, and although the number of transactions here does not, on its own, prove Claxton's knowledge of the character of the conspiracy, it does make it more likely that he knew the business he was about. It also helps explain what Isaac meant when he called Claxton a "member of the organization." (Joint App. at 136.) Indeed, Claxton's repeated assistance in the transport of large sums of drug money prompts a fair inference that the references at trial to his membership in "the organization" (*see, e.g.*, *id.* at 102 (Turnbull's testimony that "another member of the organization" would pick up the couriers if Mark did not do so himself)) constituted proof of something more than passive or unwitting participation in a vaguely suspicious enterprise involving some other form of contraband.

While different people played different roles in Springette's organization and the evidence indicates that there

---

[15] Using one of two aliases, Claxton dealt with various couriers on eight different occasions when they visited the Virgin Islands to transport drug money from North Carolina on Isaac's behalf. Claxton did that by working with the same cast of characters – the three couriers, Isaac, and Butchie – and, with some minor variations, performing the same general tasks.

were various degrees of culpability among the conspirators,[16] the organization's purpose was to traffic drugs and the jury heard multiple witnesses testify about the roles various conspirators played in facilitating that objective. (*See id.* at 65 (Springette's testimony that Turnbull was Springette's "eyes and ears overseas" who helped him "do drug trafficking"); *id.* at 95-96 (Turnbull's testimony that Mark was "brought into the organization" in 1999 and that his role was to transport cocaine from the Virgin Islands to North Carolina); *id.* at 126 (Isaac's testimony that he was "the main guy in North Carolina to receive and sell multiple kilos of cocaine and send[] the proceeds back to St. Thomas").) Claxton's role was, in Isaac's words, to "retrieve the girls out of the airport[,] … take them to Mark, check them into the hotel and pay them." (*Id.* at 136.) Given the sums of money involved, it was fair for the jury to understand that this was not a task for just anyone – it was a job for a "member of the organization" (*id.* at 102), and even high-ranking members of the conspiracy, such as Mark, completed it on some occasions.[17]

---

[16] As Claxton correctly points out, the testimony regarding his involvement with the couriers covered only a brief period of the charged conspiracy. Springette, moreover, did not know or deal with him.

[17] Acknowledging that "we have not explicitly so stated" (Dissenting Op. at 2), our dissenting colleague posits that knowledge can be inferred from a defendant's participation in a conspiracy "only when dominion and control over the contraband is inherent to the role that the defendant agreed to perform," (*Id.* at 3). Thus, he says, it cannot logically be inferred that Claxton had knowledge of drugs since he only had dominion and control over the

Moreover, the jury could draw inferences about Claxton's knowledge of drugs based on his association with, and close proximity to, other conspiracy members and the facilities of the organization. *See Reyeros*, 537 F.3d at 279 n.12 (noting that the defendant's knowledge of drugs was also supported by the close relationship between the defendant and his coconspirator brother).[18] The organization had a base

_____

conspiracy's drug money. Our task, however, is simply to determine whether the jury could have rationally concluded that Claxton knowingly participated in the drug conspiracy and, as we have tried to make plain, we do not rely solely on his specific role in the conspiracy in concluding that a jury could make that finding. Moreover, the fact that Claxton repeatedly had dominion over large sums of smuggled money does not diminish his culpability as a participant in a conspiracy that aimed to distribute cocaine for "significant financial gain and profit" (Joint App. at 43), but, rather, is part of the justification for the jury's conclusion that Claxton knew what he was doing.

[18] The dissent argues that our reliance on *Reyeros* is misplaced because there is "no evidence that Claxton's relationships with his co-conspirators suggested a particular level of closeness akin to a fraternal relation that would make it more likely they would confide in each other." (Dissenting Op. at 8.) That reading of *Reyeros* overstates the significance of the particular relationship at issue in that case. As we observed in *Boria*, *see supra* note 11, evidence of a prior relationship between the defendant and the coconspirators was lacking in many of the cases in which we held the evidence of knowledge to be insufficient. *See, e.g.*, *Thomas*, 114 F.3d at 405 (observing that there was "no evidence that [the defendant] had any prior relationship with [the alleged

24

known as "the farm" at which it stored its cocaine, and it also had a business known as the "feed shop" through which Springette's drug money was laundered. Witnesses at trial testified that Claxton frequented both venues. Wright and Roberts both testified that Claxton took them to the feed shop during their visits to the Virgin Islands, while Isaac stated that he visited the farm on at least ten occasions and saw Claxton and other organization members there during those visits.

Isaac's testimony to that effect is particularly significant. According to Isaac, the farm had a specific "function … to th[e] organization," serving as a place where organization members would meet to "talk about drug activities and fight dogs." (Joint App. at 155-56.) Although a jury reviewing that testimony might have concluded that Claxton simply "ke[pt] bad company," which would not suffice to establish a conspiracy conviction, *United States v. Cooper*, 567 F.2d 252, 255 (3d Cir. 1977), the verdict instead reflects that the jury found that Claxton did know what he was involved in, and we are bound by that determination so long as it was not irrational,[19] *see Brodie*, 403 F.3d at 133

coconspirators], or even knew them"). Its presence in this case is obviously not decisive as to Claxton's knowledge, but – as in *Reyeros* – distinguishes this case from those in which we have rejected drug conspiracy verdicts and helps tip the scale in favor of rationally inferring Claxton's knowing complicity. *See Iafelice*, 978 F.2d at 98 (explaining that knowledge can be proven "grain-by-grain until the scale finally tips").

[19] Our dissenting colleague claims that the evidence "equally support[s] the inference" that Claxton had knowledge of drugs as it does "an inference that Claxton had

25

("Courts must be ever vigilant in the context of Fed. R. Crim. P. 29 not to usurp the role of the jury by ... substituting its judgment for that of the jury."). The verdict here is entirely rational, because Isaac's testimony regarding the conversations that took place at the farm, when considered alongside the rest of the evidence in this case, buttresses the fair and logical circumstantial inference that Claxton knew he

---

knowledge that the conspiracy's object was weapons or some other contraband." (Dissenting Op. at 6.) We cannot agree with that reading of the record. The evidence at trial demonstrated that the organization which Claxton was a member of dealt drugs, not "weapons or some other contraband." (*Id.*) There is no hint in the record that anyone thought the business of the conspiracy was guns or counterfeit Gucci purses or anything else. It was a drug ring, and there is ample evidence that those involved, especially repeat players like Claxton, knew it. Without repeating all of the evidence that we have outlined here, it is worth noting again that, in addition to the nature of his role and his identification by a coconspirator as one of the "member[s] of the organization" (Joint App. at 136) – not as an unknowing dupe of the organization – Claxton regularly frequented the Farm, where the nature of the conspiracy was openly discussed. In any event, the fact that there might be competing inferences that can be drawn from the evidence is immaterial, because there is "no requirement … that the inference drawn by the jury be the only inference possible or that the government's evidence foreclose every possible innocent explanation." *Iafelice*, 978 F.2d at 97 n.3. The jury needed only to be able to rationally conclude that Claxton had some knowledge of the drug dealing in which he was involved, and it could certainly do that on this record.

was helling to transport drug money.[20]  *See Cartwright*, 359 F.3d at 291 (circumstantial evidence suffices if it has a "logical or convincing connection to established fact").

Put another way, the fact that Claxton was identified as a member of a drug-trafficking organization by an admitted-

---

[20] Although we would uphold the jury's verdict regardless, Claxton's knowledge of drugs is further supported by the evidence regarding Claxton's visit to Atlantic City with Isaac during which Isaac attempted to make $60,000 to settle a cocaine-debt dispute with Mark.  Claxton contends that we should discount that evidence because Isaac did not specify when the gambling trip was made and the record can be read to suggest it occurred after the conspiracy concluded with respect to a post-conspiracy debt.  But because the jury heard Isaac's testimony about the Atlantic City trip and it was not stricken from the record, we must consider that evidence in our sufficiency analysis.  *See McDaniel v. Brown*, 130 S. Ct. 665, 672 (2010) (noting a reviewing court must "'consider all of the evidence admitted by the trial court,' regardless whether that evidence was admitted erroneously" (quoting *Lockhart v. Nelson*, 488 U.S. 33, 41 (1988))); *United States v. Clay*, 667 F.3d 689, 701 (6th Cir. 2012) (same); *cf. Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1198-99 & n.27 (3d Cir. 1993) (holding that evidence improperly admitted should not be considered in determining a motion for judgment as a matter of law, but recognizing a different rule applies in criminal cases).  Moreover, even if the trip occurred after the conspiracy terminated, it demonstrates Claxton's close relationship with Isaac and thus advances the logical inference of Claxton's knowledge that the other evidence in this case prompts.

conspirator, that he repeatedly did that organization's bidding, that he was entrusted to help transport large sums of money, that he visited the place where that money was laundered, and that he frequented the place where the organization's drugs were stored and its business discussed all strongly suggest that he was aware of his role in the conspiracy for which he was prosecuted. The totality of those circumstances was more than enough to allow the jury to rationally decide beyond a reasonable doubt that he was guilty. *See Brodie*, 403 F.3d at 134 ("In conducting the sufficiency inquiry, we do not view the government's evidence in isolation, but rather, in conjunction and as a whole."); *Iafelice*, 978 F.2d at 98 (noting that knowledge may be proven circumstantially "grain-by-grain until the scale finally tips").

## III.   Conclusion

Consequently, we will uphold the jury's conclusion that Claxton was a knowing member of Springette's drug-trafficking conspiracy, and will reverse the District Court's judgment of acquittal and remand for Claxton to be sentenced.

*United States v. Claxton,* No. 11-2552, dissenting.

COWEN, *Circuit Judge*.

Although I agree with the majority that the evidence is sufficient to support an inference of Claxton's knowledge of his participation in an illicit conspiracy, I disagree that the evidence meets this Circuit's standard from which to infer that Claxton had "knowledge of the specific illegal objective contemplated by the particular conspiracy, i.e. [possession with intent to distribute] a controlled substance." *United States v. Boria*, 592 F.3d 476, 481, 482 n.9 (3d Cir. 2010) (noting that this Circuit's standard to show knowledge in a conspiracy charge is perhaps stricter than other Courts of Appeals). As a result, I respectfully dissent and would affirm the District Court's judgment of acquittal.

The majority primarily relies on testimony that Claxton was a "member of the organization," who was in charge of retrieving money couriers from the airport. While the majority acknowledges that this testimony does not "expressly refer to Claxton's knowledge of drugs . . . [and] require[s] the jury to make an additional inference to establish such knowledge," it never articulates what that "additional" inference from which to infer knowledge is, let alone how that inference, or series of inferences, is logical. (Maj. Op. 20-21.) Rather, the majority highlights additional facts—the large size of the organization, and that Claxton performed his role several times and had prior relationships with his co-conspirators—as additional evidence which supports an inference of knowledge.

The facts highlighted by the majority, taken individually or together, do not satisfy our requirement of "some additional piece of evidence imputing knowledge of drugs to the defendant." *Boria*, 592 F.3d at 482. Evidence of knowledge, or evidence supporting an inference of knowledge, might take a variety of forms, including a co-conspirator's statement implicating a defendant, as in *Boria*, 592 F.3d at 484, or a co-conspirator's trial testimony implicating a defendant, as the majority holds. But paramount to the form of evidence is its substance; by focusing on the presence of a co-conspirator statement implicating Claxton in the conspiracy to analogize this case with *Boria*, the majority overlooks the substance of the statements in this case and in *Boria*. In *Boria*, the co-conspirator's statement established that the defendant's role required him to have dominion and control over the contraband. In contrast, Claxton's co-conspirator's trial testimony implicating him as a "member of the organization" and his subsequent descriptions of Claxton's role do not evidence that his role required dominion and control over the contraband; indeed, they establish the opposite. The additional facts highlighted by the majority do not fill the void of evidence—which, I agree, can be direct or circumstantial—from which to infer knowledge, even if viewed as a whole. As a result, the District Court's judgment should be affirmed.

### a. Inferring Knowledge Based on Being a "member of the organization."

Although we have not explicitly so stated, an examination of our precedent to reconcile those cases in which evidence is sufficient with those in which evidence is insufficient reveals that an inference of knowledge can be

2

drawn from the fact of a defendant's participation in a conspiracy, i.e., identification as a "member of the organization," only when dominion and control over the contraband is inherent to the role that the defendant agreed to perform. A comparison of *Boria* and *United States v. Cooper*, 567 F.2d 252 (3d Cir. 1977), in which both defendants had control over a vehicle that transported drugs, illustrates this principle. In *Boria,* we held that the evidence was sufficient to support an inference of knowledge; in *Cooper*, the evidence was insufficient.

The defendant's role in *Boria* was to drive a truck containing drugs to a garage and unload the drugs. *Boria* 592 F.3d at 486. We held that this role imputed to Boria the requisite knowledge to sustain the verdict. The "additional fact necessary to support the jury's guilty verdict" was that "the tractor-trailer [Boria] was assigned to direct to a garage contained drugs." *Id*. at 485. Acknowledging the suspicious circumstances establishing that "Boria knew something criminal was afoot," we went on to state that "testimony that Boria was responsible for unloading the drugs . . . serves as the crucial additional fact imputing knowledge of drugs, as opposed to some other form of contraband." *Id.* In reaching the conclusion, we relied on *United States v. Iafelice*, 978 F.2d 92, 97 (3d Cir. 1992), in which there was sufficient evidence to support knowledge based on the "distinguishing fact" that the defendant owned and operated a vehicle used to transport drugs and "an owner and operator of a vehicle usually has dominion and control over the objects in his or her vehicle of which he or she is aware, and usually knows what is in that vehicle." *Id.*

3

In *Cooper*, 567 F.2d at 254-55, by contrast, the defendant and a co-defendant drove a vehicle containing drugs from Colorado to Pennsylvania. There was no evidence that the defendant had access to the padlocked rear compartment containing the drugs, or that he otherwise exercised control over the contraband. Despite the fact that the two spent several days alone together on the road and shared a motel room, giving them sufficient time to discuss the conspiracy and its object, the court did not infer knowledge based on the relationship between the two or the length of time of the transaction. We held that the evidence was insufficient to support the defendant's participation in the conspiracy.

Further, *United States v. Thomas*, 114 F.3d 403 (3d Cir. 1997), shows that dominion and control over the contraband must be *inherent* to the role a defendant plays in the conspiracy (i.e., the job description agreed to), and not a consequence of the tasks the defendant was supposed to perform. In *Thomas* the defendant was asked by a co-conspirator to check a hotel room to make sure a suitcase was there. The defendant obtained a key and checked the room. We found this insufficient to infer knowledge that the defendant knew what was in the suitcase. While the defendant had an opportunity to take control over the contraband, her role stopped short of her doing so. *See also United States v. Cartwright*, 359 F.3d 281 (3d Cir. 2004); *United States v. Salmon*, 944 F.2d 1106 (3d Cir. 1991); *United States v. Wexler*, 838 F.2d 88 (3d Cir. 1988) (where the only evidence against a defendant implicates him as a "look-out" or in a counter-surveillance role, with neither dominion nor control over the contraband, we have held that the evidence is

4

insufficient to support an inference of knowledge of the conspiracy's object).

Moreover, we have held that evidence of knowledge was insufficient even when the defendant's role arguably required dominion and control over the contraband, albeit momentarily. *United States v. Idowu*, 157 F.3d 265, 268 (3d Cir. 1998). In *Idowu*, the defendant's co-conspirator told him to open the suitcase that was supposed to contain the contraband and check that the contraband was there. But we still held that that the evidence did not support the critical inference that the defendant knew the transaction was a drug transaction prior to its occurrence. The only two inferences that were proper from the evidence were that the defendant had a preexisting relationship with the co-conspirator and that the defendant knew he was involved in an illicit transaction. These inferences were insufficient to support knowledge.

In view of our precedent, the fact that the jury might have "rationally concluded that Claxton knowingly participated in the drug conspiracy," (Maj. Op. 23-24 n. 17), is not a sufficient fact from which to infer Claxton's knowledge that the object of the conspiracy was drugs. There is no evidence that Claxton's role in the conspiracy gave him any dominion or control over the contraband. He was solely in charge of retrieving women who were carrying money— not contraband—from the airport, occasionally paying them, and getting them to their accommodations. While our precedent might support imputing to Claxton knowledge that the conspiracy involved large sums of money, some additional evidence is required to show knowledge of the conspiracy's object. The organization's size, "sums of money involved," that it was "fair for the jury to understand that this

5

was not a task for just anyone," and that "there is no hint in the record that anyone thought the business of the conspiracy was guns . . . or anything else" (Maj. Op. 25-26, n. 19) do not transform defendant's role into one that gave him dominion and control over the contraband—a necessary characteristic under our case law in order to draw an inference of knowledge based on a defendant's participation in a conspiracy. Nor do these facts otherwise support an inference of Claxton's knowledge of the specific object of the conspiracy. These facts might lead to a logical inference that Claxton knew of an illicit purpose of the conspiracy, but they equally support the inference drawn by the majority—Claxton's knowledge of drugs—and an inference that Claxton had knowledge that the conspiracy's object was weapons or some other contraband. The fact that other members of the conspiracy knew of its object, an inevitable fact in any conspiracy, does not establish Claxton's knowledge. Indeed, to base a conclusion on such evidence would undermine our mandate that "guilt must remain personal and individual." *United States v. Brodie*, 403 F.3d 123, 134 (3d Cir. 2005) (quotations omitted). As a result, I cannot agree that these facts establish "knowledge of the *specific* illegal objective contemplated by the particular conspiracy." *Boria*, 592 F.3d at 481 (emphasis added).

Further, that Claxton performed this role on multiple occasions does not create an inference of knowledge. Just as there was no evidence to suggest that the *Cooper* defendant's knowledge changed from the first day of the car ride to the last, no evidence suggests that Claxton's knowledge changed from the first transaction to the last, or provides any reason from which to infer that it should have changed. The sole fact that Claxton performed virtually the same role repeatedly

6

does not impute knowledge of drugs to the defendant, as opposed to knowledge of any other contraband.

### b. Claxton's "association with and close proximity to other conspiracy members."

In addition to evidence of the size of the conspiracy, Claxton's role in it, and the number of times Claxton performed the role, the majority states that an inference of Claxton's knowledge could be drawn from "his association with, and close proximity to, other conspiracy members and facilities of the organization." (Maj. Op. 24.) In making such an inference, the majority discounts our clear findings in *Idowu* that a prior relationship could be inferred and the defendant was a "trusted member" of the conspiracy and our holding in that case that there was insufficient evidence of knowledge. *Idowu*, 157 F.3d at 268. Moreover, the majority does what this Court has repeatedly warned against: it infers knowledge based on a defendant's presence at a crime scene, e.g., *Cartwright*, 359 F.3d at 286-89, and "keeping bad company," *Wexler*, 838 F.2d at 91. And it contradicts our mandate that "guilt must remain individual and personal." *Boria*, 592 F.3d at 481

To draw an inference based on Claxton's relationships with his co-conspirators, the majority relies on *United States v. Reyeros*, 537 F.3d 270 (3d Cir. 2008); but the majority's reliance on *Reyeros* in support of this proposition is misplaced. In *Reyeros* other evidence had already "tip[ped] the scale in favor of rationally inferring" (Maj. Op. 24-25 n. 18) knowledge of the conspiracy's object: there was direct evidence of knowledge. *Reyeros*, 537 F.3d at 279 n. 12. In *Reyeros*, a co-conspirator testified that the defendant, a

7

Customs Inspector who was conspiring to import cocaine, told another co-conspirator, who was the defendant's brother, that the defendant would not work with a quantity less than 500 kilos. As we held, "[t]hat testimony is sufficient to allow a rational juror to conclude beyond a reasonable doubt that [the defendant] was aware that the purpose of the conspiracy was to import cocaine as opposed to some other form of contraband." *Id.* at 279. This was direct evidence of knowledge because the defendant's quantity requirements would be meaningless and without any context otherwise.

Against this backdrop of direct evidence of knowledge, in a footnote we stated that the prior relationship between the defendant and his co-conspirator in *Reyeros* was an example of "other evidence [that] support[ed] the conclusion" because the "jury could reasonably infer that [defendant] would ask his own brother [] the nature of the contraband for which he was putting his Customs career at risk." *Id.* at 279 n. 12. This evidence was insignificant to the holding in *Reyeros*. And to the extent that it is relevant to "knowing complicity" (Maj. Op. 24-25 n. 18), "knowing complicity" in a conspiracy does not establish knowledge of drugs. Furthermore, even if *Reyeros* tangentially supports drawing an inference or knowledge based on a prior relationship, the case is easily distinguishable from Claxton's. There is no evidence that Claxton's relationships with his co-conspirators suggested a particular level of closeness akin to a fraternal relation that would make it more likely that they would confide in each other, or that Claxton risked losing any type of gainful legitimate employment, let alone a "career" by performing this role. And, to the extent that the *Reyeros* defendant's job as a Customs Inspector might be a basis for an inference about his competency and intelligence, from

8

which it might have been reasonable to infer that he would have sought complete information, no evidence supports any inference about Claxton's intelligence or level of sophistication.

In the same footnote, we also highlighted the testimony that the defendant was going "to receive a percentage of the value of any cocaine imported, which suggest[ed] that [the defendant] would want to know the nature of the contraband so that he could understand the payoff." *Id.* No evidence of how Claxton was compensated, or that his compensation was in any way linked or related to the contraband, is in the record.

The majority also relies on the fact that a co-conspirator saw Claxton at "the farm" and that the organization's members "talk about drug activities and fight dogs" at the farm. At best, this establishes that some members of the conspiracy knew of its object. But, like in *Idowu* and *Cooper*, there is no evidence that Claxton was part of or privy to any conversations about drugs. *Idowu*, 157 F.3d at 266; *Cooper*, 567 F.2d at 254. *See also United States v. Rodriquez-Valdez*, 209 Fed. Appx. 178 (3d Cir. 2006) (although in an unpublished decision, we held there were insufficient facts to support defendant's knowledge under remarkably similar circumstances currently before the court because there was no testimony that the object of the conspiracy was ever discussed with the defendant or in his presence). An inference of knowledge under these facts requires inferences that Claxton's co-conspirators would speak freely around him, that Claxton was at the farm while drugs were being discussed, and that he was in close enough vicinity of any discussion to hear it. Like in *Idowu*, there is

9

"no evidence that would justify the jury's inferential leap" between these inferences. *Idowu*, 157 F.3d at 269. "Conspiracy cannot be proven 'by piling inference upon inference' where those inferences do not logically support the ultimate finding of guilt." *Brodie*, 403 F.3d at 134 (citation omitted). Indeed, the fact that another of Claxton's co-defendants was seen at the farm, but not involved in any illegal activity (JA 117), establishes, consistent with the principle that guilt should not be presumed based on presence at a crime scene, *Cartwright*, 359 F.3d at 286-89, that presence at the farm alone cannot be a proxy for knowledge of the object of the conspiracy.

Finally, the majority states that an alternative basis from which to infer knowledge is the trip Isaac and Claxton took to Atlantic City after Isaac received and sold his last shipment of cocaine from Mark. (SA 8, JA 174.) Even assuming that this evidence could be properly considered, inferring knowledge based on this trip requires an inference that Isaac discussed the purpose of the trip with Claxton, and that he specified that the debt he sought to pay related to the conspiracy of which Claxton was a part and mentioned drugs. Claxton could have thought that the trip was simply entertainment. And, even drawing these inferences, it is impossible that any discussion occurred during the conspiracy because Isaac's need to take the trip arose after he sold the final shipment of cocaine from Mark, and, therefore, after there is evidence of Claxton's participation in the conspiracy. *See Idowu*, 157 F.3d at 269.

### c. Evidence as a Whole

10

The majority urges that the "totality of circumstances" establishes Claxton's knowledge. But the totality of circumstances, while relevant to contextualize a specific piece of evidence from which to infer knowledge, does not support a logical inference of knowledge when there is otherwise no evidence from which to infer knowledge. In both *Boria* and *Iafelice*, 978 F.2d at 97, we highlighted the totality of the circumstances, characterized them as "suspicious" and sufficient to support an inference of knowledge that "something criminal was afoot." *Boria*, 592 F.3d at 485-86. We then relied on a specific piece of additional evidence to support an inference of knowledge of the conspiracy's object. We emphasized that these pieces of evidence distinguished the cases from precedent holding there was insufficient evidence. Similarly, in *Reyeros*, we highlighted the totality circumstances to bolster the direct evidence of knowledge. *Reyeros*, 537 F.3d at 279 n. 12.

Unlike in any of these cases, where we held there was the "additional evidence needed to uphold a jury verdict of guilty," "[m]ore evidence was needed to establish that [Claxton] knew drugs were involved in the crime." *Iafelice*, 978 F.2d at 98. While the totality of circumstances might support an inference that Claxton "knew that something criminal was afoot," there is no "crucial additional fact imputing knowledge of drugs, as opposed to some other form of contraband." *Boria*, 592 F.3d at 486.

For the foregoing, the evidence is insufficient to show that the defendant knew that the object of the conspiracy was drugs, rather than some other form of contraband. I, therefore, respectfully dissent and would affirm the judgment of the District Court.

11