**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-3768
_____

UNITED STATES OF AMERICA,

Appellant

v.

RICHARD CARABALLO-RODRIGUEZ

_____

On appeal from the United States District Court
For the Eastern District of Pennsylvania
(District Court No. 2-08-cr-00328-002)
District Judge: Honorable Cynthia M. Rufe

_____

Argued on March 5, 2013 before Merits Panel
Court Ordered Sua Sponte Rehearing En Banc on
March 12, 2013
Argued En Banc on May 29, 2013

Before:  McKEE, <u>Chief Judge</u>, SCIRICA, RENDELL,
AMBRO, FUENTES, SMITH, FISHER, CHAGARES,
JORDAN, HARDIMAN, GREENAWAY, JR., VANASKIE
and SHWARTZ, <u>Circuit Judges</u>.


(Filed: August 8, 2013)

Zane David Memeger, Esquire
United States Attorney
Robert Zauzmer, Esquire **(Argued)**
Assistant United States Attorney
Chief of Appeals
Joseph T. Labrum, III, Esquire
Office of United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA   19106

                        Counsel for Appellant


Christopher D. Warren, Esquire **(Argued)**
1500 Walnut Street, Suite 1900
Philadelphia, PA   19102

                        Counsel for Appellee

## OPINION

**RENDELL,** <u>Circuit Judge</u>:

This case is the last in a long line of cases in which the parties and the district courts have had to divine whether, notwithstanding the jury's guilty verdict, there was sufficient evidence—and whether we would conclude there was sufficient evidence—for the jury to have determined that the defendant knew that the object of the conspiracy in which he participated was a controlled substance, as opposed to some other type of contraband. We say that this case is "the last" because, after considerable thought, we have concluded that, in many of these opinions, we failed to apply the deferential standard the law requires on review of sufficiency of the evidence challenges. In those cases, we employed what we have called a "strict approach"—which has been criticized by other judges and commentators[1]—and in doing so, failed to apply the proper deferential standard that we routinely apply in reviewing other criminal cases when a defendant challenges the sufficiency of the evidence.

---

[1] *See, e.g.*, *United States v. Sliwo*, 620 F.3d 630, 641 n.3 (6th Cir. 2010) (Katz, J., dissenting); Diana Eisner Lipschutz, Comment, *"Are You Telling Me Those Computer Chips Were Really Heroin?": A Look at the Third Circuit's Scope of Appellate Review for Accomplice Liability in Controlled Substances Crimes*, 82 Temp. L. Rev. 497, 519 (2009).

A jury concluded that Defendant Richard Caraballo-Rodriguez knew that he was transporting a controlled substance when he participated in a conspiracy to transport approximately five million dollars' worth of cocaine from San Juan, Puerto Rico to Philadelphia, Pennsylvania.[2] Relying on the reasoning of our previous opinions in considering Caraballo-Rodriguez's post-trial motion for acquittal, the District Court disagreed with the jury's verdict because "the evidence only shows that Caraballo-Rodriguez knew that he was being entrusted with a large suitcase which could contain [] a 'wide variety of contraband items . . . including stolen jewelry, laundered money, stolen computer chips, and counterfeiting plates.'" (Supp. App. 44 (quoting *United States v. Idowu*, 157 F.3d 265, 268 (3d Cir. 1998)).) The District Court therefore granted Caraballo-Rodriguez's motion and entered a judgment of acquittal.

After hearing oral argument in this case, we voted to rehear the case en banc to address "our circuit's seemingly

---

[2] In this case, the government requested that the jury be instructed on willful blindness, which the District Court granted. Thus, the government could satisfy the "knowledge" requirement by demonstrating actual knowledge or willful blindness, which is "a subjective state of mind that is deemed to satisfy a scienter requirement of knowledge." *United States v. Wert-Ruiz*, 228 F.3d 250, 255 (3d Cir. 2000). Willful blindness, however, "is not to be equated with negligence or lack of due care. . . . [Rather,] the defendant himself [must have been] subjectively aware of the high probability of the fact in question, and not merely that a reasonable man would have been aware of the probability." *Id*; *see also* note 7, *infra*.

paradoxical standard of review" on sufficiency of the evidence challenges in drug conspiracy cases. *United States v. Boria*, 592 F.3d 476, 488 n.12 (3d Cir. 2010) (Fisher, J., concurring). We did so to decide whether our review in this discrete area should follow form with the "strict approach" established by our precedent, or whether we will reestablish a familiar course with respect to sufficiency of the evidence challenges in other situations. We have decided to do the latter, returning to the deferential review standard we normally apply.

For the reasons that follow, we will vacate the District Court's order and remand for further proceedings consistent with this opinion.

**I**.

On May 1, 2008, Appellee Richard Caraballo-Rodriguez and one of his co-defendants, Luis Deya-Diaz, triggered the suspicion of the Drug Enforcement Administration ("DEA") when they purchased last-minute one-way airplane tickets from San Juan, Puerto Rico to Philadelphia International Airport in cash, checked no luggage, and held no carry-on baggage.[3] As a result, DEA agents in Philadelphia organized a surveillance team at the airport.

Despite not having checked any baggage, both Deya-Diaz and Caraballo-Rodriguez proceeded to the baggage claim after deplaning. Another co-defendant, Juan Cordero,

---

[3] Deya-Diaz testified that he "had like an overnight bag with [him]." (Supp. App. 322.)

met the two men at the baggage claim. Deya-Diaz retrieved two suitcases bearing distinctive markings from the baggage carousel and followed Cordero out of the terminal and into a parking garage. Caraballo-Rodriguez stayed in the baggage claim area by himself, collected two additional suitcases with distinctive markings, and then walked with the suitcases to the parking garage.

In the parking garage, two vehicles were parked near each other—a Suburban and a minivan. Deya-Diaz and Caraballo-Rodriguez were each responsible for delivering the suitcases to the Suburban and were then directed by Cordero to get in the minivan. DEA agents then observed the two vehicles leave the parking garage, going opposite directions on Interstate 95. A man named Wilfredo Aquino drove the Suburban northbound, and Cordero drove the minivan southbound with Deya-Diaz and Caraballo-Rodriguez as passengers.

Aquino was pulled over in the Suburban shortly after leaving the airport. The state trooper who pulled him over obtained consent to search the vehicle and found the four suitcases in the back. According to the trooper, the bags were quite heavy.[4] He then broke the locks on the suitcases and saw bricks of cocaine packed in the suitcases. A search warrant subsequently confirmed that two of the suitcases had

---

[4] Specifically, the state trooper testified: "I can't remember exactly now whether I pushed them, or drug them, or tried to move them, and it was like they didn't move, I mean it was heavy. I'm like well, that's not clothes, that's for sure, there's no way." (Supp. App. 125.)

twelve kilograms each of cocaine, and the other two suitcases had thirteen kilograms of cocaine each. In total, there were nearly fifty kilograms of cocaine between the four bags.[5] An expert testified that the shipment had a retail value of approximately $5 million.

Meanwhile, the minivan driven by Cordero was stopped by state troopers on I-95 South after a state trooper observed the minivan swerve between lanes and take evasive actions. Cordero, Deya-Diaz, and Caraballo-Rodriguez were all taken into custody. The agents recovered cell phones from the men upon arrest—Cordero's phone was missing the chip that stores information and call history because Cordero had thrown the chip out of the driver-side window before being pulled over. Deya-Diaz was carrying $456 in cash, Caraballo-Rodriguez had $33 in cash, and Cordero had $1,173 in cash. At the police barracks, only Deya-Diaz gave a statement—he provided a story about his reasons for traveling to Philadelphia, claiming that he was going to Cordero's house in either New Jersey or New York, and that he had no idea that Caraballo-Rodriguez was also meeting Cordero at the airport.

A grand jury in the Eastern District of Pennsylvania returned an indictment charging Caraballo-Rodriguez, Cordero, and Deya-Diaz with conspiring to distribute cocaine, in violation of 21 U.S.C. § 846, possession of cocaine with the intent to distribute, and aiding and abetting possession

---

[5] The parties stipulated that a laboratory test found that the total quantity of all the cocaine was 49.1 kilograms, with a cocaine purity of 76%.

with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Deya-Diaz subsequently entered a guilty plea and testified against Caraballo-Rodriguez and Cordero, who both proceeded to trial and were tried jointly.[6]

While on the stand, Deya-Diaz recanted the story he gave at the police barracks and testified that he had previously acted as a courier, shuttling cash between Puerto Rico and New York. Before September 11, 2001, Deya-Diaz would travel with large amounts of cash strapped to his body; after September 11, he transported suitcases with cash from North America to Puerto Rico. Although Deya-Diaz had transported cash on several prior occasions, he testified that he had not knowingly transported drugs before. According to Deya-Diaz, in April 2008, an unidentified Dominican male known to Deya-Diaz as "Domi" called him and offered him $5,000 to fly to from Puerto Rico to Philadelphia and pick up two suitcases at the Philadelphia airport. Domi told Deya-Diaz that someone would recognize him at the airport and take him to the parking garage, where Deya-Diaz would turn over the suitcases. The trip was originally planned for April 25, 2008. Before the flight, Deya-Diaz met Domi in Puerto Rico, and Domi repaid Deya-Diaz for the plane tickets, showed him the suitcases he was to retrieve in Philadelphia, asked Deya-Diaz to describe what he would wear at the airport, and told Deya-Diaz that he would be paid $5,000 when he arrived in New York, after being driven from the Philadelphia airport. Domi subsequently called Deya-Diaz

---

[6] After a magistrate judge found that there was not probable cause to support the arrest of Aquino, the prosecution did not charge Aquino in the indictment.

8

and told him that the trip was rescheduled for May 1. Deya-Diaz testified that no one told him that there were drugs in the suitcases, and that he did not know that any other courier would be on the flight.

Deya-Diaz further testified that Caraballo-Rodriguez was not there when Deya-Diaz put his suitcases in the Suburban, but that Caraballo-Rodriguez entered the van after he was already seated. During the ride, Deya-Diaz asked Cordero when he would be paid, but Deya-Diaz did not remember Caraballo-Rodriguez saying anything. Deya-Diaz testified that he, Cordero, and Caraballo-Rodriguez were brought to the police barracks and while there, the three of them discussed concocting a story to explain why they were in Philadelphia.

When Deya-Diaz was questioned about his knowledge of the contents of the suitcases, he initially said "I didn't know it was drugs. I knew that it was something bad that was happening, because nobody is going to pay five thousand dollars for picking up the suitcases." (Supp. App. 308.) The questioning continued:

> Q:  Now, going back to May 1st of 2008, did anyone tell you what was going to be in the suitcases on that occasion?
>
> A:  No.
>
> Q:  And what did you understand would be in the suitcases?

A:      My common sense tells me that paying five thousand dollars just to come to Philadelphia to pick up two suitcases at the airport, it wasn't for clothing.

Q:      And did you –

A:      I always guessed that it was something illegal.

Q:      And did you come to realize it was drugs?

A:      When the suitcases came down from the conveyor and I picked up both suitcases, I noticed that for their size they were very heavy.

(*Id.* at 312.)  On cross-examination, Deya-Diaz said that when he picked the suitcases up, he knew they contained "something forbidden," and "guessed" that it was drugs.  (*Id.* at 429.)  He added, "[c]ommon sense, drugs.  Who else would take five thousand dollars to pick up a suitcase full of clothes?"  (*Id.* at 435.)

The government introduced phone records indicating that Deya-Diaz had received calls from, and placed calls to, the same phone number several times between April 25 and May 1.  Deya-Diaz testified that this number belonged to Domi.  Caraballo-Rodriguez's phone records indicated that he had had similar contact with the same phone number throughout the same time period, although there was no evidence as to the substance of those calls.  Before the May 1 flight, both Deya-Diaz's phone and Caraballo-Rodriguez's phone contacted that number as well.

The government also presented expert testimony of a state narcotics agent, Alan Basewitz. Agent Basewitz testified that this case involved several indicia of organized drug trafficking:

> If they have no checked bags, it's a cash one way ticket, it's coming from San Juan, and there is no carry on baggage from a passenger, those characteristics in combination are something that I would, if I could, go lights and siren to the airport to observe, not to arrest, to see if anybody is going to be claiming baggage.

(*Id.* at 615-16.) Agent Basewitz also described the typical characteristics of couriers:

> They are trusted individuals. The couriers, if you're transporting a significant amount, their addresses or families and information are known to the person who is either coordinating or supplying. The inverse is not true, in most instances. And they have to be trusted because of the amounts that they ferry back and forth, both if it's cash, depending on which direction you're heading, or if it's drugs.
>
> They are, sometimes, trained what to say to police, if they're told to ignore them or come up with a concoction of a story. It is a very risky thing. Sometimes they are not told the exact type of drug. Quite often during my proffers and interviews and intelligence information through conversations with informants and

cooperators and other law enforcement and most through my personal interactions with these individuals, they know it's drugs. They may not know the type, depending on the group. They may not know the weight. But, they know or should have known that it's drugs.

(*Id.* at 622-23.)[7]

After a five-day trial, in which the government presented the evidence discussed above, the jury was instructed and given its charge. The District Court gave a willful blindness instruction at the government's request.[8] On

---

[7] Agent Basewitz distinguished the present situation from a "blind mule" situation, such as when a person is asked to carry a bag for a person known to him or when a baggage handler switches baggage tags and a person's tag is placed on another suitcase containing drugs. (Supp. App. 624-26.)

[8] The District Court's willful blindness instruction stated, in pertinent part:

In this case, there is a question whether . . . Richard Caraballo-Rodriguez knew that the luggage in question contained cocaine. When, as in this case, knowledge of a particular fact or circumstance is an essential part of the offense charged, the government may prove that . . . Caraballo-Rodriguez deliberately closed his eyes to what would otherwise have been obvious to him.

July 6, 2009, the jury returned a verdict convicting both Caraballo-Rodriguez and Cordero of conspiracy to distribute

> No one can avoid responsibility for a crime by deliberately ignoring what is obvious. Thus, you may find that . . . Caraballo-Rodriguez knew that the luggage in question contained cocaine based on evidence which proves that: (1) . . . Caraballo-Rodriguez consciously and deliberately tried to avoid learning about this circumstance.
>
> You may not find that . . . Caraballo-Rodriguez knew that the luggage in question contained cocaine if you find that the defendant actually believed that this circumstance did not exist. Also, you may not find that . . . Caraballo-Rodriguez knew that the luggage in question contained cocaine if you find only that . . . Caraballo-Rodriguez should have known of the circumstance or that a reasonable person would have known of a high probability of the circumstance. It is not enough that . . . Caraballo-Rodriguez may have been stupid or foolish, or may have acted out of inadvertence or accident. You must find that . . . Caraballo-Rodriguez [was] actually aware of a high probability of the fact that the luggage in question contained cocaine, deliberately avoided learning about it, and did not actually believe that it did not exist.

(Supp. App. 32 n.134.)

13

and possess with intent to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. § 846, and possession of more than five kilograms of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1).

Thereafter, Caraballo-Rodriguez and Cordero filed a joint post-trial motion for acquittal, which the District Court granted as to Caraballo-Rodriguez on September 7, 2011. Looking to our precedent, the District Court concluded that the government's evidence was not sufficient to support an inference that Caraballo-Rodriguez knew that the object of the conspiracy was drugs. The District Court observed that: (1) Deya-Diaz's testimony did not include "statements . . . made to or about" Caraballo-Rodriguez, and therefore Deya-Diaz's testimony did not "alter the calculus of evidence"; (2) the government did not present any evidence of the substance of the phone calls placed and received by Caraballo-Rodriguez; (3) there was no evidence of a prior relationship between the men; and (4) there was no evidence that Caraballo-Rodriguez had acted as a courier before. (Supp. App. 32-39.) In considering Agent Basewitz's testimony, the District Court surmised that "[i]f the jury accepted Basewitz's testimony, it may have . . . infer[red] that because Caraballo-Rodriguez was a courier, he knew the object of the conspiracy was to smuggle drugs." (*Id.* at 39.) Despite the fact that the jury heard Agent Basewitz's testimony and Caraballo-Rodriguez did not object to it, the District Court nonetheless concluded that "in the absence of any other evidence from which the jury could permissibly draw an inference of knowledge, the court will not permit an expert's conclusory statements about the defendant's mental state to tip the

14

balance." (*Id.* at 44.) Accordingly, the District Court entered a judgment of acquittal as to Caraballo-Rodriguez.[9]

The government's timely appeal followed.

**II.**

We exercise plenary review over an appeal from the grant of a judgment of acquittal, and independently apply the same standard the district court uses in deciding the motion. *See Boria*, 592 F.3d at 480.

Today we consider that standard. The way courts—our Court and district courts—review challenges leveled at the sufficiency of the evidence in criminal trials is a fairly basic topic upon which many courts have expounded. As the Supreme Court stated in *Jackson v. Virginia*, 443 U.S. 307 (1979), "the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction . . . is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 318-19 (emphasis in original). While we have set forth the standard many times since *Jackson*, today we grapple with how to faithfully adhere to it.

---

[9] As to Cordero, the District Court held that "[a]lthough this is admittedly a close case, we conclude that the Government's evidence against Cordero was sufficient to support the jury's verdict." (Supp. App. 49.) We address Cordero's appeal in a separate opinion.

15

**III.**

Notwithstanding careful recitations of the appropriate standard to apply when ruling on sufficiency of the evidence claims, we have applied that standard in a more searching manner when the issue involves knowledge of a controlled substance. As noted below, this has produced inconsistent results in drug conspiracy cases. In the present appeal, the government urges that, sitting en banc, we should abandon our case law that dissects the evidence presented at trial. It insists that the jury's verdict in this case is justified under an ordinary sufficiency of the evidence standard of review. Caraballo-Rodriguez, on the other hand, argues that this case falls squarely within our line of precedent in which we have held that the government failed to present "specific evidence" of the defendant's knowledge of the transaction's subject matter.

A.

To prove a conspiracy, the government must show: (1) a shared unity of purpose; (2) an intent to achieve a common illegal goal; and (3) an agreement to work toward that goal. *Boria*, 592 F.3d at 481 (citing *United States v. Mastrangelo*, 172 F.3d 288, 291 (3d Cir. 1999)). The government must establish each element beyond a reasonable doubt. *United States v. Coleman*, 811 F.2d 804, 808 (3d Cir. 1987). It may do so with direct or circumstantial evidence. *United States v. Brodie*, 403 F.3d 123, 134 (3d Cir. 2005). Circumstantial inferences drawn from the evidence must bear a "logical or convincing connection to established fact." *United States v. Cartwright*, 359 F.3d 281, 291 (3d Cir. 2004).

When considering drug conspiracy cases over the past several decades, we have viewed the second element—

16

"illegal goal"—as requiring proof that the defendant had knowledge of the specific objective contemplated by the particular conspiracy. *Id.* at 287. As mentioned above, "knowledge" can be demonstrated by actual knowledge or willful blindness. *See Brodie*, 403 F.3d at 148 ("The knowledge element . . . may be satisfied upon a showing beyond a reasonable doubt that a defendant had actual knowledge or deliberately closed his eyes to what otherwise would have been obvious to him concerning the fact in question." (internal quotation marks omitted)). Pursuant to that requirement, we have examined the record in each case to determine whether the government put forth "drug-related evidence, considered with the surrounding circumstances, from which a rational trier of fact could logically infer that the defendant knew a controlled substance was involved in the transaction at issue." *Boria*, 592 F.3d at 481. While "we have explicitly recognized that the government may circumstantially establish the element of knowledge 'grain-by-grain until the scale finally tips,'" *United States v. Claxton*, 685 F.3d 300, 310 (3d Cir. 2012) (quoting *United States v. Iafelice*, 978 F.2d 92, 98 (3d Cir. 1992)), in many cases we have nonetheless meticulously scrutinized the nature and quality of the evidence, essentially reweighing it. As a result, we have reached inconsistent conclusions regarding the "knowledge" prong in our sufficiency of the evidence test in drug conspiracy cases.

The trend that we revisit today began in *United States v. Wexler*, 838 F.2d 88 (3d Cir. 1988). Looking back at *Wexler* recently in *Claxton*, we characterized the path we had taken: "we have arguably asked more of prosecutors than our statements regarding the adequacy of circumstantial evidence express, requiring some additional piece of evidence imputing

17

knowledge of drugs to the defendant even in the presence of otherwise suspicious circumstances." *Claxton*, 685 F.3d at 306 (internal quotation marks, alteration omitted). In *Wexler* and several subsequent cases, we found that the government had not offered specific evidence from which a jury could infer that the defendant knew that a controlled substance—as opposed to some other contraband—was the object of the conspiracy. That failure, we held, was fatal and required acquittal.

In *Wexler*, we concluded that the evidence, which suggested that the defendant served as a lookout in a conspiracy to transport hashish, was not sufficient for the jury to find that the defendant knew that drugs were the object of the conspiracy. 838 F.2d at 91-92. The defendant had engaged in surveillance during the course of the drug delivery, signaled to the driver of the truck containing the hashish, talked to one of the drivers of the truck on two separate occasions, and upon his arrest had a portable CB radio he had purchased the day before under a false name. *Id.* at 89-90. We nonetheless found that the record was "missing 'the totality of evidence from which a reasonable juror could logically infer' that [the defendant] had knowledge of the object of the conspiracy." *Id.* at 92 (quoting *Coleman*, 811 F.2d at 808). Although we noted that there was "ample circumstantial evidence . . . from which the jury could have concluded that [the defendant] was involved in a conspiracy . . . and that the conspiracy involved movement of the cargo of the truck," we concluded that there was no evidence that the defendant knew that a controlled substance was the cargo in the truck. *Id.* at 91. Notwithstanding the fact that the jury had inferred that the defendant knew of the object of the conspiracy, we noted that "[t]he evidence [was] just as

consistent, for example, with a conspiracy to transport stolen goods, an entirely different crime." *Id.* at 92.

Citing *Wexler*, we concluded similarly in *United States v. Salmon* that the evidence was insufficient for the jury to find that the defendant knew that drugs were involved in the transaction at issue and reversed the conviction. 944 F.2d 1106 (3d Cir. 1991). There, the defendant had also performed surveillance, spoken to co-conspirators, and possessed surveillance equipment when he was arrested. *Id.* at 1114. Additionally, the defendant opened a car's trunk, and an alleged co-conspirator approached the trunk and appeared to retrieve a package of cocaine. *Id.* We rejected the government's argument that the defendant's movements in the parking lot combined with the consistency and wrapping of the cocaine in a brown paper bag could allow a reasonable jury to find beyond a reasonable doubt that the defendant knew that cocaine or another controlled substance was the object of the transaction. *Id.* We noted that the government had not established that the package was ever in the trunk, and that there was no evidence that the defendant knew what the package contained. *Id.* at 1114-15.

We also reversed the jury's verdict against the defendant in *United States v. Thomas*, 114 F.3d 403 (3d Cir. 1997). There, the defendant's co-conspirator, who was cooperating with law enforcement, left a suitcase from which drugs had previously been seized in a hotel room, and left a key to the room at the front desk. *Id.* at 405. The defendant, who was offered $500 by a stranger to enter the hotel room, confirm the presence of the suitcase, and leave the door open, was arrested after he exited the room. *Id.* at 404-05. There was no evidence of a prior relationship between the defendant

19

and the co-conspirators, no evidence that the defendant had actually spoken to the co-conspirators, no evidence of the substance of suspicious phone calls placed and received by the defendant, and no evidence that the defendant had even picked up the suitcase. *Id.* at 405-06. Citing *Wexler*, we concluded that although the defendant "knew that he was somehow involved in an illicit activity," under our case law "there [was] no evidence from which a jury could permissibly infer that [the defendant] knew that the object of the conspiracy was to possess cocaine with the intent to distribute." *Id.* at 405, 406.

We next addressed the sufficiency of the evidence in a drug conspiracy case in *United States v. Idowu*, 157 F.3d at 266. In that case, the defendant's co-conspirator negotiated to buy two kilograms of heroin from a DEA informant. *Id.* at 267. During the transaction, the defendant was introduced to the DEA informant as the driver. *Id.* The defendant removed a bag of cash from the trunk of the car, assured the informant that the money was all there, and removed personal documents from the bag before handing it to the informant. *Id.* The defendant also removed a suitcase from the informant's car, placed it in his own car, opened the suitcase, noticed that it was empty, and told his co-conspirator that "[t]hey didn't pack this thing." *Id.* at 267-68. The informant attempted to reassure the defendant and his co-conspirator that something was concealed in the frame of the suitcase. *Id.* at 268.

The jury convicted the defendant of conspiracy to possess with intent to distribute heroin. *Id.* at 266. We reversed, finding a "lack of specific evidence of [his] knowledge of the transaction's subject matter." *Id.* at 270.

20

Although it was "crystal clear that [the defendant] was—and knew that he was—involved in an illicit transaction of some sort," a divided panel concluded that there was not "sufficient evidence that [he] knew that the subject matter of the transaction was a controlled substance, rather than some other form of contraband, such as stolen jewels or computer chips or currency." *Id.* at 266.

In dissent, Judge Stapleton urged that the evidence supported the jury's guilty verdict, noting that the jury could have drawn permissible inferences from the facts: namely that there was significant risk in the transaction, the defendant was a "trusted confidant," and the defendant had sole custody of the cash at times. *Id.* at 271 (Stapleton, J., dissenting). Furthermore, he observed that the defendant was assigned to check the bag to make sure it contained what his co-conspirator had negotiated for, from which the jury could have easily inferred that the defendant knew his co-conspirator was not paying for stolen jewels, computer chips, or currency. *Id.* Under a "common sense approach to the evidence," Judge Stapleton concluded that "the jury properly could conclude that [the defendant] was guilty as charged beyond a reasonable doubt." *Id.*

More recently, in *United States v. Cartwright*, 359 F.3d 281, we again concluded that the government had fallen short of adducing evidence of the defendant's knowledge that the conspiracy involved drugs. In that case, the defendant served as a lookout during a drug transaction. *Id.* at 286. After the drug supplier retrieved drugs from his car—which was in an area where there was no law enforcement surveillance—he returned accompanied by the defendant. *Id.* at 284. The government argued that the jury properly inferred

21

the defendant's knowledge because: (1) the defendant first appeared at the same time that the drug supplier was observed carrying a bag of cocaine; (2) the defendant walked side-by-side with the drug supplier, and the two were observed talking with each other; (3) the defendant possessed a loaded semi-automatic firearm, a cellular phone, $180 in cash, and a two-way text messaging device upon his arrest; and (4) the defendant did not possess keys to a vehicle of his own. *Id.* at 288. Noting that "where an inference as to a defendant's knowledge is based upon speculation, our case law forbids us from upholding his conviction," we concluded that the jury's inference that the defendant knew of the subject matter of the transaction was impermissible because it was based solely on speculation. *Id.* (citing *Thomas*, 114 F.3d at 406). Accordingly, we reversed the judgment against the defendant.

We have subsequently viewed this line of cases as requiring "some additional piece of evidence imputing knowledge of drugs to the defendant." *Boria*, 592 F.3d at 482. There has been confusion, however, as to what sort of evidence must be offered to demonstrate "knowledge." As Judge Fisher noted in his concurring opinion in *Boria*, "[i]t may be that the difficulty of producing evidence that the defendant knew that the subject matter was a controlled substance has turned our standard of review, not in name but in application, into a requirement for direct evidence." *Id.* at 488 n.12 (Fisher, J., concurring); *see also Claxton*, 685 F.3d at 305-06 ("In drug conspiracy cases . . . we have arguably asked more of prosecutors than our statements regarding the adequacy of circumstantial evidence express . . . .").

To add to the confusion, we have been inconsistent in conducting our review of this knowledge element in drug

conspiracy cases. In another line of cases, addressing factual situations not that different from the cases discussed above, we purported to apply "our strict approach to sufficiency in drug conspiracy cases," but affirmed the jury's verdict because it drew what we viewed as a proper inference of knowledge. *Claxton*, 685 F.3d at 307 (quoting *Boria*, 592 F.3d at 481 n.9).

For example, in *United States v. Iafelice*, 978 F.2d at 93, we held that the government's evidence was sufficient to show that the defendant knew that he was participating in a criminal enterprise involving drugs, and we reversed the district court's grant of defendant's motion for acquittal. In *Iafelice*, the defendant drove a car to a drug transaction, engaged in counter-surveillance before the drug deal, opened the trunk, which contained the package of drugs, and took a phone call during the course of the drug deal from his co-conspirator who had negotiated the drug sale with an undercover DEA agent. *Id.* at 94. In upholding the jury's verdict—and reversing the district court—we observed the suspicious circumstances, and noted that "[t]he crucial additional fact that the drugs were transported in a car owned and operated by [the defendant] (coupled with the other evidence . . . ) provide[d] the essential additional evidence necessary to distinguish this case from the more limited facts of *Wexler* and *Salmon*." *Id.* at 97. As we noted, "[c]ommon sense counsels that an owner and operator of a vehicle . . . usually knows what is in that vehicle." *Id.*

Then, in *United States v. Reyeros*, 537 F.3d 270 (3d Cir. 2008), we concluded that a co-conspirator's testimony could provide additional evidence to allow a rational juror to conclude beyond a reasonable doubt that a defendant knew

23

the purpose of a drug conspiracy. *Id.* at 279. In that case, two brothers—Juan and Jorge Reyeros—negotiated with several individuals to import cocaine into the United States. *Id.* at 275-77. At trial, a co-conspirator testified that Juan told the other members of the conspiracy that Jorge, a customs inspector, would facilitate the importation, but the shipment would have to be large enough to make it worth the risk to Jorge's career. *Id.* at 276. After the jury returned a guilty verdict and the district court denied the brothers' motions for acquittal, we concluded that the co-conspirator's testimony would permit a rational juror to conclude that Jorge knew the purpose of the conspiracy. *Id.* at 279. We also noted that "[o]ther evidence supports that conclusion as well," such as the fact that "a jury could reasonably infer that Jorge would ask his own brother, Juan, the nature of the contraband for which he was putting his Customs career at risk," as well as the fact that Jorge was to receive a percentage of the imported cocaine's value, which suggested that he would want to know the nature of the contraband. *Id.* at 279 n.12.

Following a drug conspiracy conviction in *United States v. Boria*, 592 F.3d at 480, the district court granted the defendant's motion for acquittal. On appeal, however, we concluded that there was sufficient evidence for a rational jury to conclude that the defendant, who drove a tractor-trailer that contained cocaine hidden among boxes of rotten fruit, knew "something criminal was afoot." *Id.* at 486. Although that, by itself, was not sufficient to sustain a conspiracy verdict, we held that a co-conspirator's testimony describing the defendant's role in the conspiracy sufficed to enable a rational jury to find that the defendant had knowledge that he was participating in a conspiracy involving drugs. *Id.* We reversed the district court's ruling, explaining

24

that the suspicious circumstances and the "truly distinguishing fact" that the co-conspirator testified that the defendant was responsible for unloading drugs from the truck and "tak[ing] the driver of the tractor-trailer to finish off what needs to be done inside the truck . . . impute[d] to [the defendant] knowledge that the tractor-trailer he was assigned to direct to a garage contained drugs, which is the additional fact necessary to support the jury's guilty verdict." *Id.* at 485. As previously mentioned, Judge Fisher concurred separately to note "the tension between this opinion and some of our most recent case law." *Id.* at 486 (Fisher, J., concurring).

Most recently, in *United States v. Claxton*, 685 F.3d at 301, we held that the evidence was sufficient to prove that the defendant knew that the object of the conspiracy was drugs, reversing the district court and upholding the jury's guilty verdict. The government presented evidence that the defendant was a member of a group of individuals who routinely brought cocaine from Colombia into Venezuela, and then flew the cocaine to the Virgin Islands so that it could be smuggled into the continental United States. *Id.* at 302. Although there was no evidence that the defendant handled drugs himself, a co-conspirator testified that the defendant "retriev[ed] the girls out of the airport in St. Thomas, [took] them to [another co-conspirator], check[ed] them into [a] hotel[,] and [paid] them." *Id.* (internal quotation marks omitted). Consistent with this testimony, the "girls"—women hired to transport the drug sales' cash proceeds from North Carolina to the Virgin Islands—testified as to their encounters with the defendant. *Id.* at 302-04. Furthermore, another co-conspirator repeatedly identified the defendant as a member of the organization, and testified that he had met with the defendant several times at a property where the organization's

cocaine was stored and where members of the organization talked about drug activities.  *Id.* at 304.

A divided panel concluded that "the evidence, as a whole, permits . . . a finding [of knowledge of the conspiratorial object] because [the defendant] was expressly identified as a member of the conspiracy, repeatedly took actions to further its ends, and had a close and repeated association with its members and facilities."  *Id.* at 309.  We held that although the co-conspirator testimony in this case was different from that offered in *Boria*, the jury reasonably inferred that the defendant knew the object of the conspiracy given the totality of the evidence.  *Id.* at 312.  Although a jury *could have* concluded that the defendant simply kept bad company, we determined that we were bound by the jury's determination that the defendant knew what he was involved in, as long as it was not irrational.  *Id.*[10]

In his dissenting opinion, Judge Cowen attempted to reconcile our precedent regarding the sufficiency of the evidence in drug conspiracy cases.  He observed that "an examination of our precedent" suggested that "an inference of knowledge can be drawn from the . . . identification as a 'member of the organization,' only when dominion and control over the contraband is inherent to the role that the defendant agreed to perform."  *Id.* at 314 (Cowen, J., dissenting).  Judge Cowen also believed that the majority's reliance on the "totality of the circumstances" was

---

[10] We see the majority opinion in *Claxton* as perhaps presaging today's ruling, as the majority there grappled with the quantum of evidence and concluded that, given the totality of the circumstances, the jury verdict should stand.

26

inconsistent with our precedent because the "totality of the circumstances" analysis in our prior cases "relied on a specific piece of additional evidence to support an inference of knowledge of the conspiracy's object." *Id.* at 318. He further opined that acquittal was required because the evidence "equally support[ed] the inference drawn by the majority—[the defendant's] knowledge of drugs—and an inference that [he] had knowledge that the conspiracy's object was weapons or some other contraband." *Id.* at 315. Thus, because the "additional" evidence required by our case law was lacking, he concluded that the verdict should not stand. *Id.* at 318.

B.

In looking back at these cases, our analysis has too often been more akin to ad hoc second-guessing the juries' verdicts than exercising a review function based on sufficiency of the evidence.

We have set forth the appropriate standard in a sufficiency of the evidence challenge many times. We "review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt[] beyond a reasonable doubt." *Brodie*, 403 F.3d at 133 (internal quotation marks and citation omitted). Under this particularly deferential standard, we "must be ever vigilant . . . not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting [our] judgment for that of the jury." *Id.* Furthermore, "we review the evidence as a whole, not in isolation, and ask whether it is strong enough for a rational trier of fact to find guilt beyond a reasonable doubt." *Boria*,

592 F.3d at 480. We must sustain the jury's verdict "if there is substantial evidence, viewed in the light most favorable to the government, to uphold the jury's decision." *United States v. Gambone*, 314 F.3d 163, 170 (3d Cir. 2003) (internal quotation marks omitted).

However, in this particular area—drug conspiracy cases—it appears that we have examined sufficiency by looking at the evidence under a microscope. In all other areas, our review for sufficiency is, as noted above, highly deferential, and we will overturn a verdict only "if no reasonable juror could accept the evidence as sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt." *Coleman*, 811 F.2d at 807 (quoting *United States v. Campbell*, 702 F.2d 262, 264 (D.C. Cir. 1983)); *see also United States v. Kemp*, 500 F.3d 257, 293 (3d Cir. 2007) (upholding the jury verdict in a public corruption case and noting that "'[t]here is no requirement . . . that the inference drawn by the jury be the only inference possible or that the government's evidence foreclose every possible innocent explanation'" (quoting *Iafelice*, 978 F.2d at 97 n.3)); *Brodie*, 403 F.3d at 126 (reversing the district court's grant of defendant's motion for acquittal in a case in which the defendant was convicted of violating the American-Cuban embargo by conspiring to trade with Cuba).

That deference is warranted because we trust jurors to judge the evidence, and we instruct them as to all aspects of their decision making. Jurors are instructed extensively as to what evidence they can consider, how to consider it, and how to assess the credibility of witnesses, as well as the relevant legal principles. We trust that they follow these instructions. *See, e.g.*, *United States v. Sussman*, 709 F.3d 155, 180 (3d

28

Cir. 2013) ("[T]he law presumes that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them." (internal quotation marks omitted)). Yet, in most of the cases discussed above, we have not trusted the jurors. Indeed, we have second-guessed them, acting not merely as the thirteenth juror, but as the decisive vote on the jury. Too often, we failed to ask whether any reasonable juror could conclude that the defendant knew the transaction involved drugs; instead, we reassessed the evidence independently. Had we asked the appropriate question—"whether . . . *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt"—we now believe the answer in most, if not all, of those cases would have been "yes." *Jackson*, 443 U.S. at 319 (emphasis in original).

The confusion generated by the inconsistent results in our case law has worked to bedevil not only those adducing the evidence—the prosecution—but also those who are called upon to assess the evidence after the fact—namely, district court judges. Thus, we take this opportunity to clarify the appropriate standard to apply in reviewing a sufficiency of the evidence challenge in drug conspiracy cases. The district court—and we—are not to act as a thirteenth juror. Instead, the jury's verdict must be assessed from the perspective of a reasonable juror, and the verdict must be upheld as long as it does not "fall below the threshold of bare rationality." *Coleman v. Johnson*, 132 S. Ct. 2060, 2065 (2012) ("The jury in this case was convinced, and the only question under *Jackson* [*v. Virginia*] is whether that finding was so insupportable as to fall below the threshold of bare rationality.").

Furthermore, we take this opportunity to clarify that, although the prosecution must prove the defendant's knowledge of the conspiracy's specific objective, that knowledge need not be proven by direct evidence. To the contrary, "[i]t is not unusual that the government will not have direct evidence. Knowledge is often proven by circumstances. A case can be built against the defendant grain-by-grain until the scale finally tips." *Iafelice*, 978 F.2d at 98. Again, jurors are routinely instructed that their verdict can be supported by direct or circumstantial evidence, and reasonable inferences can be drawn from both types of evidence.

With this in mind, we specifically disavow the reasoning we previously embraced—that the jury's verdict could not stand when the evidence was as consistent with contraband other than controlled substances, even though a jury could rationally conclude that the defendant knew the subject of the conspiracy was drugs. We specifically disavow our concern in *Wexler*, for instance, that "[t]he evidence is just as consistent, for example, with a conspiracy to transport stolen goods, an entirely different crime." 838 F.2d at 92. While evidence proffered at trial may be consistent with multiple possibilities, our role as a reviewing court is to uphold the jury verdict—and not to usurp the role of the jury—as long as it passes the "bare rationality" test. Reversing the jury's conclusion simply because another inference is possible—or even equally plausible—is inconsistent with the proper inquiry for review of sufficiency of the evidence challenges, which is that "'[t]he evidence does not need to be inconsistent with every conclusion save that of guilt if it does establish a case from which the jury can find the defendant guilty beyond a reasonable doubt.'"

*United States v. Cooper*, 567 F.2d 252, 254 (3d Cir. 1977) (quoting *United States v. Allard*, 240 F.2d 840, 841 (3d Cir. 1957)).  It is up to the jury—not the district court judge or our Court—to examine the evidence and draw inferences.  Unless the jury's conclusion is irrational, it must be upheld.  In our role as reviewers, we must resist the urge to hypothetically insert ourselves into the jury room for deliberations.

Of course, a finding as to a defendant's knowledge is a fact-specific inquiry, and we cannot prescribe a specific formula as to what conduct or evidence is sufficient to infer knowledge.  Indeed, no one factor is dispositive, and the jury is carefully instructed as to how it must view the evidence in a given case.  As we stated in *United States v. Cooper*, "'[t]he question is whether all the pieces of evidence against the defendant, taken together, make a strong enough case to let a jury find him guilty beyond a reasonable doubt.'"  567 F.2d at 254 (quoting *Allard*, 240 F.2d at 841).  Nothing "additional" in the way of evidence as to knowledge is required.

In reiterating this deferential standard, we are aligning ourselves with the majority of our sister circuits, from whom we had previously parted ways.  In *Boria*, we specifically noted in a footnote that most other courts of appeals do not "adhere to our strict approach to sufficiency in drug conspiracy cases."  592 F.3d at 481 n.9.[11]  Our approach has

---

[11] Indeed we contrasted the approaches of the Fifth, Sixth, Seventh, and Tenth Circuits with that of the Second and District of Columbia Circuits.  *See Boria*, 592 F.3d at 481 n.9 (comparing the approaches of different courts with respect to sufficiency of the evidence challenges in drug conspiracy cases).  *But see Sliwo*, 620 at 635 n.3 (citing *Wexler* in

been criticized, and as discussed above, this "strict approach" has taken us away from the application of the appropriate standard in sufficiency challenges. *See, e.g.*, *Sliwo*, 620 F.3d at 641 n.3 (Katz, J., dissenting) ("Application of *Wexler* in the Third Circuit has led to . . . peculiar results. For example, it has led Third Circuit panels to undertake detailed, thirteenth juror-type analyses of the sufficiency of the evidence at trial, in spite of the deferential standard of review that ordinarily applies in such cases."); *see also* Lipschutz, *supra*, at 510-13 (discussing cases from other circuits, which "demonstrate that the Third Circuit is enigmatic in its willingness to overturn jury verdicts in conspiracy and aiding and abetting controlled substances cases based on sufficiency of evidence challenges").

## C.

Applying our newly reestablished standard to the case before us, we conclude that the jury's verdict did not "fall below the threshold of bare rationality." *Coleman*, 132 S. Ct. at 2065. It should therefore be reinstated.

Viewing the evidence in the light most favorable to the government, as we must, the jury could have reasonably concluded that Caraballo-Rodriguez knew that he was involved in an illegal venture. Moreover, looking at the evidence that the jury considered, it is clear that it was not irrational for the jury to infer that Caraballo-Rodriguez knew—or was willfully blind to the fact—that the illegal venture involved transporting drugs.

---

reversing a jury's verdict and the district court's denial of the defendant's motion for acquittal).

The evidence introduced at trial established that Caraballo-Rodriguez traveled from Puerto Rico to Philadelphia with a small overnight bag and only $33, for the sole purpose of taking two suitcases that he had not checked and did not belong to him off the baggage conveyor and putting those suitcases into a waiting vehicle. From this, the jury could have easily concluded that he knew that was involved in an illegal venture.

Furthermore, a rational jury could have inferred that Caraballo-Rodriguez knew that the object of the venture was transporting drugs. Deya-Diaz testified that he made arrangements with Domi to be paid $5,000 to pick up suitcases that he did not check. Given that Deya-Diaz and Caraballo-Rodriguez had nearly identical phone records and took the same trip, a rational jury could have inferred that Caraballo-Rodriguez had the same arrangement. From that, a rational jury could have inferred that Caraballo-Rodriguez knew that he was being paid such a sum to transport a controlled substance. *Cf. United States v. Caminos*, 770 F.2d 361, 366 (3d Cir. 1985) (holding that an inference of deliberate ignorance was warranted when the defendant was offered over $1,000 to deliver a $60 wood carving that contained cocaine).

The evidence also suggested that Caraballo-Rodriguez was trusted to be alone with several million dollars worth of cocaine. When Deya-Diaz and Cordero walked to the parking garage, they left Caraballo-Rodriguez at the baggage carousel to pick up the two suitcases by himself. Based on that, the jury could have inferred that Caraballo-Rodriguez was not a "blind mule." As Agent Basewitz's expert testimony suggested, although drug traffickers generally do

not explicitly tell couriers what they are carrying, they do not typically trust valuable cargo to an unknowing dupe.[12]

Additionally, according to Deya-Diaz's testimony, as soon as he picked up the suitcases and felt their significant weight, he surmised that they contained drugs. A rational jury could have inferred the same knowledge on the part of Caraballo-Rodriguez. Despite the fact that no DEA agent saw Caraballo-Rodriguez specifically put the suitcases into the Suburban, it would be rational for the jury to infer that Caraballo-Rodriguez also experienced the weight of the suitcases since he was responsible for taking the suitcases from the baggage conveyor to the car. The District Court noted that Deya-Diaz had a history of transporting cash, and because he had previously felt the weight of suitcases full of cash, he knew that the heavier suitcases in this case did not contain cash, and therefore "common sense" told him they contained drugs. Although there was no evidence that Caraballo-Rodriguez had served as a courier before, it was not unreasonable for the jury to find that Caraballo-Rodriguez would have believed that the suitcases contained drugs once he picked them up. Indeed, given the totality of the evidence and surrounding suspicious circumstances, a rational jury could have inferred that "common sense" would suggest to anyone that two suitcases, each weighing at least 12 kilograms, contained drugs and not currency.

The jury certainly could have drawn other inferences. But that is not the issue. Rather, looking at "the evidence as a

---

[12] The jury heard Agent Basewitz's testimony, to which Caraballo-Rodriguez did not object. This testimony was admitted and therefore must be considered as part of the entire record. *Boria*, 592 F.3d at 480.

34

whole, not in isolation," there is enough evidence to support the jury's inference of knowledge. *Boria*, 592 F.3d at 480. The combination of Caraballo-Rodriguez's travel plans, Deya-Diaz's testimony, the phone records, Agent Basewitz's expert testimony, and the jury's own common sense accumulated "grain-by-grain" until the jury could rationally decide that "the scale finally tip[ped]." *Iafelice*, 978 F.2d at 98. This quantum of evidence provided a sufficient foundation for the jury to rationally conclude beyond a reasonable doubt that Caraballo-Rodriguez knew that the object of the conspiracy was a controlled substance. Although perhaps none of that evidence standing alone could have supported the jury's inference of knowledge, looking at the record as a whole, the jury's conclusion was not irrational. As discussed above, it is not the business of a reviewing court to play the role of an extra juror in assessing all the possible inferences that *could be* drawn.

Moreover, the jury received a willful blindness instruction, which permitted it to infer knowledge if the evidence showed that "the defendant . . . was subjectively aware of the high probability of the fact in question, and not merely that a reasonable man would have been aware of the probability." *Caminos*, 770 F.2d at 365. Given the evidence discussed above, the jury certainly could have reasonably inferred that Caraballo-Rodriguez was aware of the "high probability" that he was transporting a controlled substance.

## IV.

Our opinions with respect to sufficiency of the evidence challenges in drug conspiracy cases have not always provided the government, defendants, or judges with clear

35

guidelines.  Many cases have reached seemingly inconsistent results, because we have appeared to act as the jury in deciding which inference was the *most plausible*, rather than asking the proper question, that is, whether the jury's inference was *merely rational*.  We take this opportunity to reiterate the appropriate standard for reviewing sufficiency of the evidence claims, as discussed above.

Under that proper standard, the jury's conclusion that Caraballo-Rodriguez knew that he was involved in a drug conspiracy was rational.  Accordingly, we will vacate the District Court's judgment of acquittal and remand with directions that the District Court reinstate the jury's verdict of conviction and proceed to sentencing.