**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
THIRD CIRCUIT
_____

No. 10-4419
_____

UNITED STATES OF AMERICA

v.

DAVID GARCIA,
a/k/a TWENTY

David Garcia,
Appellant

_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(Crim. No. 2-07-cr-00549-005)
District Judge: Hon. J. Curtis Joyner

_____

Submitted Under Third Circuit L.A.R. 34.1(a)
May 23, 2014
_____

BEFORE: McKEE, *Chief Judge*, CHAGARES, *Circuit Judge*, and THOMPSON,
*District Judge*.[*]

(Filed: October 16, 2014)
_____

OPINION
_____

---

[*] The Honorable Anne E. Thompson, Senior District Judge of New Jersey, sitting by
designation.

McKEE, *Chief Judge*.

David Garcia appeals his conviction for conspiracy to distribute cocaine under 21 U.S.C. § 846 ("drug conspiracy"). His only argument on appeal is that there was insufficient evidence to support the jury's verdict. We disagree and hold that the evidence was sufficient to sustain Garcia's conviction.

## I. BACKGROUND

Garcia was convicted of drug conspiracy for his role in the Phillips Cocaine Organization ("PCO"), an interstate cocaine trafficking organization that operated between 1998 and 2007. The PCO had outlets in several jurisdictions, including New Jersey, Pennsylvania, New York, Maryland, the District of Columbia, and Virginia. The Alvear Cocaine Supply Organization ("ACSO"), which operated out of Texas and was controlled by Ramon Alvear, was a major supplier of the PCO.

The principal evidence against Garcia was Ramon Alvear's testimony that Garcia was an active member of the ACSO who had some contact with the PCO. However, a number of PCO members also testified that Garcia had been involved in the PCO's drug trafficking conspiracy. The witnesses testified that Garcia was involved in the transportation of drugs from the ACSO in Texas to the PCO in the northeastern United States, and that he aided in the transport of the payments from the PCO back to the ACSO. Garcia delivered drugs to other ACSO clients on occasion, and he was involved in helping the ACSO purchase cocaine from distributors in Mexico and Texas, some of which was resold to the PCO.

After a lengthy trial involving eleven codefendants, Garcia was convicted of drug conspiracy and sentenced to 258-month term of imprisonment followed by five years of supervised release.  As we noted at the outset, he now challenges only the sufficiency of the evidence.[1]  For the reasons that follow, we find that the evidence was sufficient to support the jury's guilty verdict.

## II.  DISCUSSION

### A.  Standard of Review

An appellant who claims that the evidence was insufficient to justify a guilty verdict faces a "heavy burden," as our standard of review is highly deferential.  *United States v. Gibbs*, 190 F.3d 188, 197 (3d Cir. 1999).  "[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction . . . is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 424-25 (3d Cir. 2013) (en banc) (quoting *Jackson v. Virginia,* 443 U.S. 307, 318-19 (1979)).

### B.  The Sufficiency of the Evidence

Garcia was convicted of conspiracy to distribute cocaine pursuant to 21 U.S.C. § 846.  "To prove a conspiracy, the government must show: (1) a shared unity of purpose; (2) an intent to achieve a common illegal goal; and (3) an agreement to work toward that goal."  *Caraballo-Rodriguez*, 726 F.3d at 425.  The government may prove each of these

_____

[1] Garcia makes a related claim that Alvear was not a credible witness.

3

elements with circumstantial evidence. *Gibbs*, 190 F.3d at 197. Indeed, "[t]he existence of a conspiracy 'can be inferred from evidence of related facts and circumstances from which it appears as a reasonable and logical inference[] that the activities of the participants . . . could not have been carried on except as the result of a preconceived scheme or common understanding.'" *Id.* (citing *United States v. Kapp*, 781 F.2d 1008, 1010 (3d Cir. 1986)).

We have stated that "a simple buyer-seller relationship, without any prior or contemporaneous understanding beyond the sales agreement itself, is insufficient to establish that the buyer was a member of the seller's conspiracy." *Id.* The converse is also true. However, "even an occasional supplier . . . can be shown to be a member of the conspiracy by evidence, direct or inferential, of knowledge that she or he was part of a larger operation." *Id.* at 198 (citations omitted). For example, we have held that evidence that a drug supplier was informed by the buyer of a third party's complaint about the drugs could establish that the supplier knew he was part of a larger drug operation, and thus that this evidence supported a conviction for conspiracy. *See United States v. Theodoropoulos*, 866 F.2d 587, 593-94 (3d Cir. 1989), *overruled on other grounds by United States v. Price*, 76 F.3d 526, 528 (3d Cir. 1996). This is true even if the supplier "had been only an occasional supplier, and did not himself know all the details, goals, or other participants of the broader conspiracy." *Id.* at 594.

4

The evidence here clearly supports the conclusion that Garcia was a member of the ACSO,[2] but the question before this Court is whether the evidence was also sufficient to prove that Garcia was co-conspirator in the PCO conspiracy. The government introduced evidence that Garcia participated in large shipments of cocaine from the ACSO to the PCO, and that he transported large shipments of money from the PCO to the ACSO. There was ample evidence from which a reasonable jury could infer that Garcia was aware that he was participating in a drug operation that went beyond the transactions in which he directly participated.

Four witnesses testified that Garcia was involved in a large drug transaction between the ACSO and the PCO, valued at $800,000 to $1,000,000, in the summer of 2003. Mark Harris and Ronald Copper worked with Maurice Phillips, the leader of the PCO. Harris and Copper testified that they hired a new driver, Marco Camacho, to deliver money to the ACSO in Texas and to transport cocaine back to the northeastern United States. Supplemental Appendix ("Supp. App.") 907-09, 1642. The money that Camacho drove to Texas originated with Phillips. *Id.* 907-09. Garcia accompanied Camacho on the trip from Pennsylvania to Texas to ensure that Camacho, who was new and not yet trusted, would not steal the money. *Id.* 907-09, 1419-24. When the truck arrived in Texas, Alvear and Garcia discussed their concerns that Camacho's truck,

---

[2] Alvear testified that Garcia started to work for the ACSO in 2002, when he began to pick up money and deliver drugs on behalf of Alvear. Supp. App. 1110. Garcia later obtained his commercial driver's license (CDL) so that he could earn more money ferrying drugs to ACSO customers and money back to the ACSO. *Id.* 1140-42. Garcia traveled to Mexico to meet with ACSO associates on multiple occasions, and he helped the ACSO develop a connection with a new cocaine supplier. *Id.* 1160.

5

which was in very bad condition, would attract unwanted attention from the Department of Transportation on the return trip. *Id.* 1142, 1419-24. Alvear explained that, if Camacho had been arrested on the return trip with the drugs, Phillips would have borne the resulting loss. *Id.* 1144. Nevertheless, following his conversation with Garcia, Alvear coordinated with Phillips to purchase a new truck. Garcia and Camacho selected and purchased the truck in Camacho's name. *Id.* Garcia also accompanied Camacho on his return trip to ensure that Camacho wouldn't steal the drugs. *Id.* 907-09, 1142, 1419-24, 1642. Garcia told Camacho that there were forty-seven kilos of cocaine on the truck. *Id.* 1424. Witnesses identified two pictures of Garcia and Camacho together around the time of this trip. *Id.* 907-09, 1142.

Witnesses also testified about other transactions that Garcia facilitated between the ACSO and the PCO. For example, Camacho testified that he made a second drug run to Texas in 2003, and that Garcia was the first person he called when he arrived. *Id.* 1425-26. Camacho had to stay in Texas for a week or two so that the truck could be repaired, and Garcia entertained him while he was there by taking him out for every meal and arranging recreational activities. *Id.* Likewise, Harris testified about two transactions that took place in the spring or summer of 2004. *Id.* 911-12. In the first transaction, Maurice Phillips told Harris that Garcia would arrive at Harris's house on a certain date, and that Harris was to collect drugs from Garcia and pay him $235,000 in return. Harris testified that Garcia came to Harris's house in a Nissan, exchanged the drugs for the money, and placed the money in a hidden stash spot in the Nissan. *Id.* He further testified that, roughly one month later and again at Phillips's direction, Harris arranged to

6

meet Garcia at his friend Ivan's house for the same purpose. This time, Garcia arrived in a Mercury Cougar, and the two again exchanged Garcia's drugs for the money Phillips had given Harris. *Id.* Alvear also testified that Garcia transported drugs to the Maryland area, where Harris was based, on multiple occasions. *Id.* 1156.

This largely consistent evidence from multiple sources supports the conclusion that Garcia had ongoing relationships with multiple PCO members and participated in large drug transactions with the PCO. From this evidence, a jury could find that Garcia shared a common illegal goal with multiple PCO members, and that Garcia worked with the PCO to achieve that goal. The force of this evidence is obvious. This is especially true in light of Alvear's testimony about the symbiotic relationship between the ACSO and the PCO, and Garcia's longstanding and consistent presence at Alvear's side over many years. The jury was free to infer that Garcia knew that the drug transactions that he helped orchestrate were part of the PCO's drug trafficking conspiracy. Garcia's arguments to the contrary are unconvincing. The evidence pertaining to Garcia's activities was specific as to dates, amounts of money, and amounts of drugs, and there was testimony that Garcia was paid for his work. Though Garcia argues that the witnesses' plea agreements raise questions about the truthfulness of the testimony, these agreements were properly disclosed. It was thus for the jury to decide whether to credit their testimony. The jury clearly accepted much (if not all) of that testimony, and the resulting record is more than sufficient to sustain Garcia's conviction.

### III. CONCLUSION

For the above reasons, we will affirm Garcia's conviction for drug conspiracy.

7