**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-3182
_____

UNITED STATES OF AMERICA

v.

DEAN ROSSI,

                                            Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-15-cr-00109-001)
District Judge: Honorable Joel H. Slomsky
_____

Submitted Pursuant to Third Circuit L.A.R. 34.1
(September 21, 2021)

Before: CHAGARES, HARDIMAN, and MATEY, *Circuit Judges*.

(Filed: September 22, 2021)

_____

OPINION[*]
_____

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

HARDIMAN, *Circuit Judge*.

Dean Rossi appeals his judgment of conviction and sentence after a jury found him guilty of defrauding three federally insured banks into loaning him approximately $4.15 million. He raises several issues on appeal, none of which persuades us. So we will affirm.

I

Though we write only for the parties, Rossi raises a sufficiency of the evidence claim and sentencing challenges that require us to explain the facts in some detail. In very general terms, Rossi conspired with title agents to obtain real estate loans by providing false documentation.

A

Rossi owned several low-income residential properties in the Philadelphia area through holding companies, including R&S Real Estate, LLC. According to the indictment, Rossi agreed to create R&S with Anthony Serrano around December 2006. Rossi's lawyer, Michael Brooks, formed R&S by December 27, 2006.

In January 2007, Brooks drafted an R&S operating agreement that listed Rossi as the company's only member. Brooks stated in a declaration that he drafted a second operating agreement dated March 30, 2007, adding Serrano (whom Brooks's declaration referred to as A.S.) as an additional member of R&S at Rossi's direction. The second agreement listed Rossi and Serrano as equal owners of the company. Serrano testified that Rossi never told him about the first operating agreement.

The Government alleged that Rossi used the first operating agreement, along with other documents misrepresenting his personal finances, to defraud Nova Bank into loaning him $1.65 million. Prosecutors argued Rossi submitted the first agreement to conceal Serrano's involvement in R&S so Nova would not investigate Serrano's credit history. Nova personnel testified that had they known Serrano owned half of R&S, they would have required him to co-guarantee the loan, and they would have reviewed his finances. They also testified that Rossi's financial documents led them to trust Rossi as a guarantor.

Rossi gave Nova the first operating agreement before attorney Brooks prepared the second agreement that included Serrano as a member of the company. The second agreement was dated the day after Nova authorized R&S's loan disbursement.

Rossi requested the loan on R&S's behalf to refinance mortgage debt on 28 residential properties (one of which did not have a mortgage at the time of closing). He pledged R&S would give Nova first-position liens on each property as collateral. But R&S did so on only 15 properties. R&S made some payments on the Nova loan before defaulting in 2009.

A key Government witness against Rossi was his title agent, Otis Johnson. Johnson testified that before the default, Rossi enlisted him to use a large percentage of the Nova loan funds for other ventures unrelated to paying off mortgages as required by the loan terms. The funding allocation was contrary to a HUD-1A loan settlement statement Johnson drafted that described the transaction as Nova understood it.

Nova sued Rossi on his guaranty and obtained a judgment for $1,591,032.69. Although Nova eventually became insolvent, the bank and its receiver—the Federal Deposit Insurance Corporation (FDIC)—sold the 15 properties on which Nova had obtained first liens, mitigating its loss on the R&S loan by $283,840.26. The District Court found that Nova's net loss was $1,307,192.43.

B

The Government accused Rossi of using a different holding company, St. Charles Place, LLC, to defraud another bank. St. Charles obtained a $1.3 million loan from First Cornerstone Bank to purchase a group of properties. Rossi instructed his broker to give First Cornerstone 2005 and 2006 tax returns the Government alleged were fraudulent, among other documents. Johnson, the title agent who facilitated the Nova transaction, prepared a HUD-1 settlement statement representing that St. Charles would use $1,250,000 in loan funds to buy the properties, and that St. Charles would incur $45,809 in settlement expenses. The HUD-1 also stated that $725,466.92 of the $1,250,000 would be used to pay back taxes on the purchased properties. This left $524,533.08 for the sellers. St. Charles was to receive just $4,191 of the remaining loan funds, and First Cornerstone was to obtain first-position liens on ten purchased properties. Rossi was a guarantor.

Johnson testified that after the bank disbursed the $1.3 million, Rossi directed him to distribute the money contrary to the HUD-1. Johnson wrote two checks to St. Charles for a total of $456,460.73, more than 100 times what the LLC was supposed to receive in loan proceeds. Johnson also wrote two checks to his own company totaling $143,723.10.

4

After these kickbacks and the $524,533.08 allotted to the sellers, there was less than $200,000 out of $1.3 million available for the $725,466.92 in back taxes due on the properties.

St. Charles made some loan payments before defaulting. First Cornerstone sued Rossi for defaulting on his guaranty, seeking the loan's outstanding principal balance of $1,218,827.57. The Government alleged the bank had to release a mortgage on one of the ten properties on which it was supposed to have a first-priority lien because it turned out St. Charles did not actually own that property. The bank later lost its liens on three of the other nine properties when the City of Philadelphia foreclosed on them. First Cornerstone foreclosed on five of the remaining six properties and resold them for $555,310.47 after transaction costs. It did not attempt to foreclose on the sixth property which, at the time of Rossi's sentencing, had an assessed value of $46,800.

By subtracting the $555,310.47 in net proceeds from the sale of the five properties and the $46,800 value of the sixth property from First Cornerstone's initial loss of $1,218,827.57, the District Court concluded that the net loss was $616,717.10. The FDIC assumed this amount as receiver for the now-defunct First Cornerstone.

C

The Government also accused Rossi of using a third entity, HB Holding Company LLC, to defraud a third bank, Leesport/VIST.[1] HB obtained a $1.2 million loan from

---

[1] Both Rossi and the Government call the third bank "Leesport/VIST." The bank was initially called Leesport before it became VIST.

Leesport/VIST to finance its purchase of 20 properties. In exchange, Leesport/VIST would receive first-position liens against each property along with Rossi's personal guaranty.

Rossi's broker testified that Rossi had him give Leesport/VIST the same allegedly false tax returns Rossi had him send Nova and First Cornerstone. Rossi then enlisted title agent Frank Dowd to facilitate the transaction.[2] Shortly before closing, Rossi told Dowd that, due to Rossi's cash flow problems, the owner of the 20 properties agreed to let the mortgages on some of the properties go temporarily unpaid after the settlement until Rossi could obtain the money to pay them. Dowd testified that he knew the bank expected the loan to be used to satisfy all outstanding mortgages on the 20 properties at the time of settlement and that it would not have issued the loan otherwise. He also testified that he knew it was illegal to disregard the bank's closing instructions, but he agreed to do so in part because he wanted to make a $12,000 commission.

Dowd put Rossi's plan in motion by preparing a HUD-1. It indicated Leesport/VIST would lend HB $1.2 million; the owner of the 20 properties would receive $470,070.58 after various reductions for expenses; and HB would contribute $522,731.58 to the settlement. Rossi signed the HUD-1 on behalf of HB. When Dowd signed the HUD-1, he knew Rossi had no intention of making HB's $522,731.58 settlement contribution.

---

[2] Dowd had entered his own guilty plea in connection with the case before testifying in Rossi's trial.

After the bank advanced the $1.2 million, Dowd transferred HB $340,965.97, giving only about $88,000 out of $470,070.58 to the seller. And per Rossi's instructions, Dowd did not use the loan proceeds to pay off mortgages on 12 of the purchased properties.

HB made some loan payments to Leesport/VIST, but stopped paying when the outstanding balance was $1,074,201.56. Leesport/VIST submitted an insurance claim to Fidelity, which reimbursed $850,000, reducing the bank's loss from $1,074,201.56 to $224,201.56.

Fidelity mitigated its $850,000 loss by foreclosing on seven properties from the HB transaction. The foreclosures reaped $107,197.69 in net proceeds. Foreclosing on the other properties was impracticable because Leesport/VIST ended up with only second-position liens on those properties, though Fidelity recouped $40,000 from the seller. In total, Fidelity recouped $147,197.69 of its $850,000 payment to the bank, reducing its net loss to $702,802.31.

## II

The Government charged Rossi with seven counts of conspiracy, fraud, and aiding and abetting offenses. A little over a month before trial, Mark Cedrone—the defense lawyer who had represented Rossi for more than a year following the indictment—moved to withdraw from the case because Rossi failed to fully pay his legal fees. At a hearing, Cedrone told the District Court that attorney Michael Brooks—who had drafted operating agreements for Rossi—was prepared to take over the representation if the trial could be postponed. Cedrone noted that Brooks might be a potential witness in the case, which

could create a conflict of interest, but Rossi would sign a conflict waiver. The Court advised Rossi that he should "want a lawyer who will act zealously on [his] behalf but within the bounds of professional responsibility." App. 215. It agreed to postpone the trial and allow Cedrone to confer with prosecutors about Brooks's potential conflict.

At a hearing the following month, Cedrone reported that the Government was concerned about the potential conflict because Brooks prepared documents (the R&S operating agreements) prosecutors might introduce at trial. Because Brooks would have to enter an appearance for the Court to rule on whether the conflict was waivable, the Court agreed to let Cedrone withdraw "the minute Mr. Brooks entere[d] his appearance." App. 232. Before doing so, the Court told Rossi that if the prosecution moved successfully to disqualify Brooks, Rossi would have to get a third lawyer. Rossi said he understood. Neither he nor the Government objected to Cedrone's withdrawal motion.

After the Government requested a hearing on the conflict issue, the District Court disqualified Brooks over Rossi's objection. The Court then appointed a new defense lawyer because Rossi could not afford one.

When the case went to trial, the Court denied in part Rossi's request to give the jury a detailed instruction about the significance of the HUD-1 settlement statements the Government introduced as evidence of fraud. It also denied Rossi's motion for a judgment of acquittal on several counts of the indictment. The jury convicted Rossi on all seven counts, and the District Court sentenced him to 60 months in prison, plus four years of supervised release and restitution of $2,850,913.40. Rossi appealed.

III[3]

Rossi challenges the District Court's order allowing attorney Cedrone to withdraw from the case; the order disqualifying attorney Brooks as defense counsel; the Court's jury instruction concerning the HUD-1 settlement statements; the sufficiency of the evidence as to the challenged counts of conviction; and the District Court's calculation of the fraud victims' losses for sentencing purposes. We consider each issue in turn.

A

Rossi claims the District Court's decisions to allow Cedrone to withdraw and then disqualify Brooks "cumulatively" violated his Sixth Amendment right to counsel. Rossi Br. 20. We disagree.

i

"Questions regarding attorney appointment and withdrawal are committed to the District Court's sound discretion, and its determination is guided by the professional rules of conduct." *United States v. Bellille*, 962 F.3d 731, 738 (3d Cir. 2020). "A district court abuses its discretion if its decision 'rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact or when no reasonable person would adopt the district court's view.'" *Doe v. Coll. of N.J.*, 997 F.3d 489, 493 n.3 (3d Cir. 2021) (quoting *In re Zoloft (Sertraline Hydrochloride) Prods. Liab. Litig.*, 858 F.3d 787, 792 n.22 (3d Cir. 2017)).

---

[3] The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

Rossi has not shown that no reasonable jurist would have granted Cedrone's withdrawal motion. Rossi's failure to fully pay legal fees distracted Cedrone and would have impaired his efficacy in the complex fraud case. Cedrone proposed an alternative advocate, Brooks, who Rossi was willing to accept as substitute counsel despite Brooks's potential conflict of interest and risk of disqualification, which the District Court explained to Rossi. Rossi did not object to Cedrone's withdrawal at any point and he agreed to sign a conflict waiver. On this record, the District Court did not err by letting Cedrone withdraw, even though some courts have noted that a client's failure to pay legal fees "usually" is not enough to justify an attorney's withdrawal. *See, e.g.*, *United States v. Parker*, 439 F.3d 81, 104 (2d Cir. 2006). And the District Court's detailed discussion with Rossi and counsel during two hearings on the withdrawal motion refutes Rossi's assertion that the Court ignored how Cedrone's withdrawal would prejudice him, harm the administration of justice, and delay the case's resolution.

ii

The Sixth Amendment creates "a presumption in favor of [a defendant's] counsel of choice, but that presumption may be overcome" by a serious potential conflict. *Wheat v. United States*, 486 U.S. 153, 164 (1988). We consider the District Court's order disqualifying attorney Brooks in two stages. First, we exercise plenary review to determine whether the District Court's decision was arbitrary, and then, if it was not, we examine the order for an abuse of discretion. *United States v. Lacerda*, 958 F.3d 196, 212 (3d Cir. 2020). A disqualification decision was not arbitrary if it was a "reasoned determination on the basis of a fully prepared record." *United States v. Voigt*, 89 F.3d

10

1050, 1075 (3d Cir. 1996) (quoting *Fuller v. Diesslin*, 868 F.2d 604, 609 n.4 (3d Cir. 1989)). Because the District Court's thorough analysis was reasoned and based on a full record, we proceed to abuse-of-discretion review.

Rossi contends the District Court disqualified Brooks prematurely; misapplied the applicable standard; inadequately considered how disqualifying Brooks would substantially harm him; and improperly rejected his conflict waiver. We are unpersuaded.

Rossi contends that disqualifying Brooks before trial was premature under Rule 3.7(a) of the Pennsylvania Rules of Professional Conduct, which in most cases bars a lawyer from "act[ing] as [an] advocate *at a trial* in which the lawyer is likely to be a necessary witness." PA. R. PRO. CONDUCT 3.7(a) (emphasis added). But because the disqualification issue arose shortly before trial, the question was whether Brooks *could be* Rossi's trial advocate. The District Court acted well within its discretion by ruling on the disqualification motion when it did. *See Wheat*, 486 U.S. at 163 (district courts have "substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses").

In addition to its timing, the substance of the District Court's disqualification decision was sound. The Court reasonably concluded that Brooks had a serious potential conflict since he created R&S and drafted the operating agreement the Government claimed was used to defraud Nova. The first R&S operating agreement was important evidence of fraud because it concealed Serrano's involvement and prevented the bank

11

from reviewing his creditworthiness. As the Court noted, Brooks could have been a Government witness called to testify about communications with Rossi concerning R&S's creation and the first operating agreement, including communications admissible under the crime-fraud exception to the attorney-client privilege. *See In re Grand Jury Subpoena*, 745 F.3d 681, 687 (3d Cir. 2014). Alternatively, Rossi might have needed to call Brooks to explain why the initial operating agreement was bona fide.

Contrary to Rossi's assertion, any stipulation about the timeline of R&S's formation and the two operating agreements did not negate the potential importance of Brooks's testimony. For instance, although Brooks told the District Court he did not know whether Rossi intended to use the first operating agreement to defraud Nova, prosecutors may have needed to establish that Rossi deceived Brooks about his use of the agreement as part of his scheme. Conversely, Rossi could have relied on Brooks's testimony to show Brooks was aware of the loan application and thought Rossi's submission of the first operating agreement was legitimate. These plausible scenarios show that Brooks's potential importance as a witness justified his disqualification as an advocate. *See United States v. Merlino*, 349 F.3d 144, 152 (3d Cir. 2003) (explaining that the fact that a defense lawyer could have been called as a witness was a "source of potential conflict" that supported disqualification).[4]

---

[4] We evaluate the District Court's disqualification decision based on the information the Court had when it ruled, but we note that Rossi ultimately called Brooks to testify at trial about R&S's formation and the operating agreements. On cross examination, Brooks admitted there was no reason for Rossi's Nova loan application to hide Serrano's involvement in R&S, given the likelihood that R&S stood for "Rossi and Serrano." Brooks also agreed that if, as the prosecution alleged, Serrano contributed property to the

12

Neither Rossi's willingness to waive the conflict nor the hardship the disqualification created establishes that the District Court abused its discretion. After the withdrawal of attorney Cedrone—who had worked on the case for over a year—Brooks's disqualification about six months later did not create enough additional prejudice to clearly outweigh the Court's duty to ensure Rossi had conflict-free counsel. *See Wheat*, 486 U.S. at 160. Rossi objects to the departure of his first two attorneys "in quick succession," Rossi Br. 36, but it was better to rule on Brooks's conflict as soon as possible to avoid additional delay as Rossi's third lawyer got up to speed. The delay was regrettable, but Rossi assumed that risk when he accepted Brooks to succeed Cedrone.

For these reasons, we hold that the District Court's withdrawal and disqualification decisions did not violate Rossi's Sixth Amendment right to counsel.

B

Next we consider whether the District Court erred by refusing to read Rossi's full proposed jury charge concerning the HUD-1 settlement statements. "We review jury instructions only to discern whether they are an accurate representation of the law." *United States v. McGill*, 964 F.2d 222, 235 (3d Cir. 1992). "Specifically, we review the charge to determine 'whether the charge, taken as a whole and viewed in the light of the evidence, fairly and adequately submits the issues in the case to the jury,' and reverse 'only if the instruction was capable of confusing and thereby misleading the jury.'" *Id.* (quoting *Link v. Mercedes-Benz of N. Am., Inc.*, 788 F.2d 918, 922 (3d Cir. 1986)).

---

R&S transaction Nova financed, that would also make it strange to submit an operating agreement that hid Serrano's role in R&S.

Where, as here, the jury instruction question turns on a matter of statutory interpretation, our review is plenary. *Id.*

To prevent the jury from drawing improper conclusions based on the HUD-1 settlement statements the Government introduced, Rossi asked the District Court to give the jury the following instruction on the "Legal Purpose of Settlement Statements." App. 190.

> The purpose of the HUD-1 or HUD-la, which are commonly referred to as a settlement statement, is to inform the respective buyer and seller of any charges, fees, or costs associated with the transaction, such as real estate agent commissions or title insurance fees.
>
> The legal purpose of a settlement statement is not to convey all of the terms of the transaction or to make representations to the parties involved except with regard to applicable charges and fees. It is also not the purpose of the settlement statement to convey information from the buyer to the seller or from the borrower to the lender. The sole purpose of a settlement statement is to provide notice to the respective buyer and seller of the charges and fees to be paid in the transaction.
>
> The obligation lies with the settlement agent, not the buyer, seller or borrower, to ensure that all charges and fees indicated on the settlement statement are accurate.

*Id.* The District Court read to the jurors only the first paragraph of the proposed instruction, adding that a "title company agent prepares the HUD-1 or the HUD-1A." App. 1128.

Rossi insists the rest of his proposed instruction was necessary because, under the Real Estate Settlement Procedures Act of 1974 (RESPA), 12 U.S.C. § 2601 *et seq.*, "the settlement statement was designed to disclose charges, costs, and fees

14

to buyers and sellers, not details of the transaction to the lenders." Rossi Br. 41. He points to 12 U.S.C. § 2603(a), which provides that "[n]othing in this section may be construed to require that that part of the standard forms which relates to the borrower's transaction be furnished to the seller, or to require that that part of the standard forms which relates to the seller be furnished to the borrower." In short, because RESPA does not require settlement statements to describe all of a transaction's terms, and because buyers or loan recipients like Rossi are not responsible for preparing such statements, a more detailed instruction was needed to prevent the jury from using the HUD-1 statements as "improper[]" evidence of Rossi's intent to commit fraud. Rossi Br. 43.

The District Court correctly concluded that the rest of Rossi's instruction—beyond the fact that a settlement statement's purpose is to list "charges, fees, or costs associated with the transaction," App. 1128—rested on a misreading of RESPA and was "misleading in the context of this case." App. 1057–59. Rossi stood accused of conspiring with title agents Johnson and Dowd to create false HUD-1 settlement statements and submit them to banks to obtain loans. The fact that a HUD-1 statement need not disclose all transaction terms and is prepared by a title agent does not mean that working with agents to submit fraudulent forms is not evidence of intent to defraud. Because we have found nothing in RESPA to support such a conclusion—and Rossi cites no precedent for his proposed jury instruction—the District Court did not err by giving a more limited instruction.

C

Rossi claims the evidence was insufficient to support his convictions on Counts 1, 2, 3, 5, and 7.[5] We disagree under our "highly deferential" standard of review. *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 424–25, 430 (3d Cir. 2013) (en banc).

Rossi makes the same argument as to all five challenged counts: that the Government did not present enough evidence to prove beyond a reasonable doubt that a scheme to defraud the banks existed and he participated in the scheme knowingly with the specific intent to defraud. Specifically, he claimed there was insufficient evidence to show that he knew about or intended to "avoid paying preexisting encumbrances, divert [loan] money, and prevent the lenders from having a first priority mortgage to collect on the collateral pledged." Rossi Br. 49. He also reiterated his contention—which we rejected above—that the HUD-1 settlement statements were not evidence of guilt.

Our review of the record evidence in the light most favorable to the Government leads us to conclude that a rational trier of fact could have found the essential elements of each offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

As to the conspiracy charge at Count 1, title agents Johnson and Dowd testified that they collaborated with Rossi to use fraudulent HUD-1 statements to obtain bank

---

[5] Count 1 charged Rossi with conspiring to commit bank fraud and mail fraud affecting a financial institution in violation of 18 U.S.C. § 1349. Count 2 charged Rossi with mail fraud affecting a financial institution in violation of 18 U.S.C. § 1341. Counts 3, 5, and 7 charged Rossi with bank fraud against Nova, First Cornerstone, and Leesport/VIST, respectively, in violation of 18 U.S.C. § 1344.

16

loans by misrepresenting how the funds would be used. *See Caraballo-Rodriguez*, 726 F.3d at 425 ("To prove a conspiracy, the government must show: (1) a shared unity of purpose; (2) an intent to achieve a common illegal goal; and (3) an agreement to work toward that goal."). There was also documentary and testimonial evidence that Rossi caused false tax returns to be submitted to the banks, along with the R&S operating agreement concealing the involvement of Serrano. So a rational jury could conclude Rossi concocted and participated in a mail and bank fraud scheme and that he acted knowingly with the intent to defraud the banks. Moreover, the substantive mail fraud and bank fraud convictions on Counts 2, 3, 5, and 7 are amply supported by: the fraudulent documents; the checks issued contrary to HUD-1 settlement statements; Johnson and Dowd's testimony; the testimony of Rossi's broker; the testimony of bank personnel; and the stipulation that the banks were all FDIC-insured financial institutions, *see* 18 U.S.C. §§ 20(1), 1341, 1344(1). Accordingly, the District Court properly denied Rossi's motion for judgment of acquittal.

## D

Finally, we consider Rossi's challenge to the District Court's loss calculation. We exercise plenary review over the District Court's interpretation of the Sentencing Guidelines—"including what constitutes 'loss'"—and examine its factual findings for clear error. *United States v. Napier*, 273 F.3d 276, 278 (3d Cir. 2001).

The following chart summarizes the District Court's loss findings, which we discussed in Part I.

| Victim | Loss |
|---|---|
| FDIC, as receiver for Nova Bank | $653,596.21 |
| Bryn Mawr Trust, as successor to Nova Bank | $653,596.22 |
| FDIC, as receiver for First Cornerstone Bank | $616,717.10 |
| Leesport/VIST Bank | $224,201.56 |
| Fidelity, as insurer for Leesport/VIST | $702,802.31 |
| **TOTAL** | **$2,850,913.40** |

Based on the $2,850,913.40 total—*i.e.*, a loss greater than $1.5 million but less than $3.5 million—the District Court applied Guideline § 2B1.1(b)(1)(I) to enhance Rossi's sentence by 16 levels.

Rossi contends his sentence should have been enhanced by 10 levels per § 2B1.1(b)(1)(F). In his view, the only loss that should count is the $224,201.56 incurred by Leesport/VIST after Fidelity's insurance payment. We disagree.

First, Rossi contends the District Court gave him no credit for payments St. Charles made to First Cornerstone. This mischaracterizes the District Court's finding, which credited Rossi for the $81,172.43 he paid toward the $1.3 million loan principal but properly excluded the interest payments. Because interest does not count as part of the loss, U.S.S.G. § 2B1.1(b)(1) app. note 3(D)(i); *see United States v. Jimenez*, 513 F.3d 62, 86 (3d Cir. 2008), the District Court correctly accounted for the St. Charles payments.

Second, Rossi claims the District Court should not have counted the $702,802.31 loss Fidelity incurred as Leesport/VIST's insurer. He offers no support for this assertion other than a citation to his District Court sentencing memorandum. So we summarily reject this undeveloped argument.

Third, Rossi claims the redressable loss arising from the Nova transaction was "virtually nil" and should not have been counted against him. Rossi Br. 51 (quoting App.

18

152). Like his previous argument, Rossi offers only a few quotations from his District Court sentencing memorandum, none of which convinces us the District Court erred.

\* \* \*

For the reasons stated, we will affirm Rossi's judgment of conviction and sentence.